UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL OUTLEY, | ) | |
| | ) | |
| Plaintiff, | ) | 17 C 8633 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| THE CITY OF CHICAGO, ALAN STARK, in his | ) | |
| individual and official capacity as Deputy Commissioner | ) | |
| of the Department of Water Management, RANDY | ) | |
| CONNER, in his individual and official capacity as | ) | |
| Commissioner of the Department of Water Management, | ) | |
| and ROBERT MUSSEN, in his individual and official | ) | |
| capacity as Chief Operating Engineer. | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael Outley sued his employer, the City of Chicago, and three officials of the City's

Department of Water Management ("DWM")—Commissioner Randy Conner, Deputy

Commissioner Alan Stark, and Chief Operating Engineer Robert Mussen—alleging violations of

Titles VI and VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d-2000e *et seq*., the Age

Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*., his union's Collective

Bargaining Agreement, the *Shakman* Accord, and 42 U.S.C. §§ 1981 and 1983. Doc. 55.

Defendants move under Civil Rule 12(b)(6) to dismiss most, but not all, of Outley's claims.

Doc. 91. The motion is granted in part and denied in part.

**Background**

In resolving a Rule 12(b)(6) motion, the court assumes the truth of the operative

complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N.*

*Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider

"documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Outley's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted). The facts are set forth as favorably to Outley as those materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth the facts at the pleading stage, the court does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

### A.    Alleged Failure to Promote to COE

DWM operates eleven pumping stations, some unmanned and others manned. Doc. 55 at ¶ 20. DWM designates a Chief Operating Engineer ("COE") to oversee each manned pumping station, while one COE located at the Chicago Avenue Pumping Station supervises all unmanned stations. *Id*. at ¶¶ 23, 26. Harvey "Skip" Hunker occupied the latter position at all relevant times. *Id*. at ¶ 27. From 1989 to 2015, all men promoted to COE were white, even though many African-Americans working as Assistant Chief Operating Engineers ("ACOE") took the test to become COE and/or applied for the position. *Id*. at ¶ 28.

Around 1985, the City contracted with DuPage County to build the Lexington Pumping Station and agreed that it would be a manned station. *Id*. at ¶¶ 21-22. Outley, an African-American man who is now sixty-three or sixty-four years old, began working at Lexington in 1993. Doc. 55 at ¶¶ 8, 18. He started as an operating engineer but soon became an ACOE. *Id*. at ¶¶ 18-19. At all relevant times, Outley was a member of the International Union of Operating Engineers, Local 399, and was covered by the Local's Collective Bargaining Agreement ("CBA"). *Id*. at ¶¶ 42-43.

Around 2010, the COE position at Lexington became open. *Id*. at ¶ 29. Outley had the most seniority of all ACOEs, and he and other African-American employees had sufficient seniority, experience, and other credentials to qualify for the open position. *Id*. at ¶¶ 30, 32. But DWM deliberately left the position open until it handpicked a white candidate to fill it. *Id*. at ¶ 33. Although DWM budgeted for a COE at Lexington, it did not post a bid announcement for the position until 2014 and did not fill it until 2015. *Id*. at ¶¶ 29, 32, 34.

When DWM interviews for an open COE position, it permits only those candidates deemed qualified by the City's Department of Human Resources ("DHR") to advance in the hiring process. *Id*. at ¶ 41. "Qualified" candidates take a three-part test. *Ibid*. The City exercised exclusive control of the test through DHR and certain other employees, particularly DWM Deputy Commissioner Alan Stark, which subjected the test to the risk of manipulation. *Id*. at ¶¶ 35-37. One part of the test was a subjective, in-person panel interview that allowed the interviewers to "elicit certain predetermined catch phrase answers rather than a correct answer to the technical question." *Id*. at ¶¶ 38, 40. From 2014 to 2017, the interview panel for open COE positions at Lexington and elsewhere included: (1) Outley's former coworkers who had been promoted over him; (2) persons who were the source of discriminatory communications towards Outley; (3) persons who were named defendants in Outley's then-pending discrimination suit, including Stark; (4) other upper level management; and (5) "other people who may or may not have technical knowledge of the skills necessary for the position of COE." *Id*. at ¶ 39. Outley applied for a promotion to COE each year from 2014 to 2017. *Id*. at ¶ 46. In 2015, DHR denied him the opportunity to sit for the COE examination. *Id*. at ¶ 50. In 2014, 2016, and 2017, Outley was deemed qualified by DHR, passed each component of the application process, and satisfied all requirements for the promotion, but was not promoted. *Id*. at ¶¶ 46-47. Instead,

DWM manipulated the process to ensure that its pre-selected candidates were promoted, denying Outley the promotion on the basis of his race and/or his age in accordance with the City's "deliberate and pervasive pattern and practice of systemic and continuing employment discrimination against Black employees." *Id*. at ¶¶ 45, 48-49, 160.

Specifically, the City promoted several white employees, including Mark Henmuellen and Joseph Lynch, to COE in 2014. *Id*. at ¶ 53. In 2015, the City promoted Robert Mussen to the COE position at Lexington. ¶ 54. Mussen, a white man, had test scores that were substantially the same as Outley's, but had less seniority. *Id*. at ¶¶ 54, 91. The City also promoted Andre Holland and Kathleen Ealey to COE in 2015 and 2017, respectively. *Id*. at ¶¶ 55, 58. Both were "much younger" and less senior, experienced, and educated than Outley. *Id*. at ¶¶ 55, 58, 201. Stark and DWM Commissioner Randy Conner exercised ultimate policy making authority over the promotions. *Id*. at ¶¶ 122, 126.

**B. Alleged Denial of Overtime and "Working Up in Grade" Opportunities and Related Retaliation**

DWM employees are given overtime opportunities based on seniority. *Id*. at ¶ 84. Although Mussen had less seniority in both time and grade than Outley, he made over $100,000 in overtime pay while Outley was denied overtime. *Id*. at ¶¶ 85-88. After Outley complained to DHR, DHR denied him the opportunity to work up in grade, including when Hunker (the COE responsible for overseeing all unmanned stations) was absent due to illness. *Id*. at ¶ 89. DHR allowed Mussen to work up in grade. *Id*. at ¶ 91. A Commissioner or Deputy Commissioner must approve opportunities to work overtime or up in grade. *Id*. at ¶ 96. As COE, Mussen had "ultimate policy making authority over overtime and working up in grade opportunities at Lexington." *Id*. at ¶ 97. To support his *Monell* claim against the City based on this conduct, Outley alleges that "the City has a deliberate and pervasive pattern and practice of systemic and

continuing employment discrimination against Black employees, including [Outley] with respect to opportunities for overtime and working up in grade," and that the City "deliberately overlooked the seniority of Plaintiff by failing to offer overtime to him at the same rate and under the same conditions that the City provides overtime opportunities to non-Black employees," thereby violating its Personnel Rules and Regulations. *Id*. at ¶¶ 83, 90, 93-94.

### C.  Alleged Hostile Work Environment and Related Retaliation

While at DWM, Outley was: (1) assigned less desirable shifts, days off, and work assignments; (2) denied promotions, transfers, overtime, opportunities to work up in grade, training opportunities, and fair compensation; (3) bullied and intimidated; (4) harassed based on race; (5) subjected to "unwelcomed racially-charged conduct," workplace violence, and harsh and undue discipline; and (6) constructively discharged. *Id*. at ¶ 61.  Among other incidents, Outley was "humiliated, harassed, and threatened daily by co-workers, supervisors, and DWM leadership, including … Mussen and Stark." *Id*. at ¶ 69.  The City, Mussen, Stark, and Conner were aware of "racially insensitive emails, screen savers, posters, cartoons, intimidating items, and graffiti, in various locations within the City's DWM pumping stations," which Outley found painful. *Id*. at ¶ 63.  Many African-American DWM employees faced "racial slurs; conduct of a racial nature; racially motivated jokes; racially insensitive communications [like] e-mail, screen savers, posters, cartoons, intimidating items, and graffiti; and unwanted verbal and physical contact based on race." *Id*. at ¶ 64.

Outley questioned his treatment and complained to the City, but in response he was "physically intimidated, threatened, verbally abused, mocked and/or ignored," and DWM instituted a "policy of retaliation," denying him "promotional, overtime and/or training opportunities." *Id*. at ¶¶ 62, 72-74.  After Outley was cleared of wrongdoing for a 2013 incident,

5

DHR told him in 2017 that the investigation remained open and held an investigative hearing. *Id*. at ¶ 66. Despite lacking credibility, several charges against Outley remained open until after he left DWM in July 2017. *Ibid*.

To support his *Monell* claim against the City based on this conduct, Outley alleges that "the City through its DHR and/or its personnel office, maintains written or unwritten policies and/or practices that create, sustain, and proliferate a hostile and abusive work environment for Plaintiff, based on race, and especially within the Lexington Pumping Station"; that those acts were "perpetuated, sustained, and created by deliberate acts allowed, sanctioned, and encouraged by [the] City's DHR"; that there were "written or unwritten policies and/or practices for excessive and unwarranted discipline" for African Americans; that the City "applies workplace rules and regulations in a racially-biased manner"; and that the City maintains "written and unwritten policies and practices regarding evaluation, compensation, and advancement in leadership and promotion" that "subjected [him] to ongoing disparate treatment based on race." *Id*. at ¶¶ 59-60, 70, 79. Outley further alleges that the treatment he and his African-American coworkers was "so pervasive that it has become the City['s] standard operating procedure" and a "department-wide pattern and practice." *Id*. at ¶¶ 76, 78.

### D. Alleged Constructive Termination

On May 30, 2017, Mussen followed Outley into the parking lot at Lexington, yanked open the door of Outley's car in an aggressive and threatening manner, and entered the car while mumbling things that Outley could not hear. *Id*. at ¶¶ 99-100. Outley was afraid that Mussen would physically attack him or damage his car. *Id*. at ¶ 100. He also thought that Mussen was trying to bait him into an altercation to drum up disciplinary charges or provide a pretext for calling the police, as DWM personnel had unjustifiably done on a previous occasion. *Id*. at

¶¶ 101-102.  Outley reported the incident as an act of workplace violence and asked DHR to preserve security camera footage.  *Id*. at ¶ 106.  On a previous occasion, when Plaintiff had been accused of committing violence in the workplace, the City retrieved surveillance footage.  *Id*. at ¶ 109.  But the City ignored Outley's request and made no attempt to preserve the footage, even though three Lexington employees witnessed the incident.  *Id*. at ¶¶ 105, 107.  Customarily, DHR removes alleged aggressors from the workplace after an employee lodges a workplace violence charge.  *Id*. at ¶ 110.  But DHR took no action against Mussen and dismissed Outley's complaint with a finding that the "activities did not rise to the level of violence in the workplace."  *Id*. at ¶¶ 108, 111.

Following the incident with Mussen, Outley felt unsafe because he realized he could not seek redress for workplace violence.  *Id*. at ¶ 116.  That incident, together with the discriminatory acts described above, made working at DWM intolerable to a reasonable person.  *Id*. at ¶ 115, 119-121, 123.  Outley resigned on July 31, 2017.  *Id*. at ¶ 121.

E.    ***Outley I***

The present suit is Outley's second arising from his employment at DWM.  In the first, *Outley v. City of Chicago*, No. 13 C 1583 (filed Feb. 28, 2013) (Lefkow, J.) ("*Outley I*"), Outley sued the City and various City employees in their individual and official capacities, including Paul Mazur, Outley's COE and immediate supervisor at the time; DWM Deputy Commissioner Stark; and then-DWM Commissioner Thomas Powers.  *Outley I*, Doc. 118 (Aug. 24, 2016).  He alleged race discrimination and retaliation under Title VI, Title VII, and §§ 1981 and 1983.  In January 2019, Judge Lefkow granted summary judgment against Outley.  *Outley I*, 354 F. Supp. 3d 847 (N.D. Ill. 2019).  Final judgment was entered.  *Outley I*, Doc. 205 (Jan. 11, 2019).  On Outley's motion, Judge Lefkow then amended the judgment to exclude from its scope claims

related to a 2017 promotion decision, reasoning that the promotion decision was made after discovery had concluded in that case. *Outley I*, No. 13 C 1583, Doc. 220 (Mar. 1, 2019). Outley did not appeal in *Outley I*.

**Discussion**

Defendants move to dismiss Outley's claims except for the Title VII claim concerning the failure to give him a 2017 promotion and the ADEA claims insofar as they concern post-October 22, 2016 conduct. Doc. 104 at 11.

**I.    Claim Preclusion**

Defendants contend that the judgment in *Outley I* precludes several claims in this case. Because Defendants' argument implicates the preclusive effect of a federal judgment in a federal question case, the federal law of claim preclusion applies. *See Taylor v. Sturgell*, 553 U.S. 880, 891 (2008) ("For judgments in federal-question cases … federal courts participate in developing uniform federal rules of res judicata.") (internal quotation marks and alterations omitted); *Ross ex rel. Ross v. Bd. of Educ. of Twp. High Sch. Dist. 211*, 486 F.3d 279, 284 (7th Cir. 2007) (holding that entry of a "final judgment for purposes of 28 U.S.C. § 1291" is "normally enough to assure finality for preclusion purposes"). The claim preclusion doctrine provides that "a final judgment forecloses successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit." *Taylor*, 553 U.S. at 892 (internal quotation marks omitted). Claims that "were, or could have been, decided in a prior suit" are precluded, so long as there is "(1) an identity of the parties or their privies; (2) an identity of the cause of action; and (3) a final judgment on the merits." *United States ex rel. Conner v. Mahajan*, 877 F.3d 264, 271 (7th Cir. 2017) (alterations omitted).

In their initial brief, which they filed after the *Outley I* court granted summary judgment and entered final judgment, Defendants contended that claim preclusion defeated Outley's "allegations that he was passed up for promotions, retaliated against for filing complaints[,] and allegedly subject[ed] to a hostile work environment." Doc. 91 at 8. A week later, the *Outley I* court granted in part Outley's reconsideration motion to exclude from the summary judgment ruling claims based on the 2017 promotion decision. *Outley I*, Doc. 220 (Mar. 1, 2019). Some two months later, Outley filed his opposition brief in this case, arguing that "a final judgement was not entered … as to all claims [in *Outley I*]" due to Judge Lefkow's partial grant of his reconsideration motion. Doc. 101 at 5. Consequently, Outley argued, "[s]ince there [was] no final judgment on the merits as to all claims addressed in Outley I, and no dismissal of all claims with prejudice, entered by the Court in Outley I after [the amended judgment], the Defendants are not entitled to a finding of *res judicata* on *any* claims herein." Doc. 101 at 6 (emphasis added). In their reply brief and at the motion hearing, Defendants agreed with Outley that his claims here are not precluded to the extent they concern 2017 conduct. Doc. 104 at 4; Doc. 106. Defendants argued, however, that the *Outley I* judgment is final, therefore precluding claims related to pre-2017 conduct. Doc. 104 at 4.

For purposes of claim preclusion, then, the key dispute is whether final judgment was entered in *Outley I*. If the *Outley I* judgment is final, Outley has forfeited any opposition to Defendants' claim preclusion arguments related to pre-2017 conduct for his Title VI, Title VII, and §§ 1981 and 1983 claims. *See Lee v. Ne. Ill. Reg'l Commuter R.R.*, 912 F.3d 1049, 1054 (7th Cir. 2019) ("[The forfeiture] rule applies when a party fails to develop arguments related to a discrete issue or when a litigant effectively abandons the litigation by not responding to alleged deficiencies in a motion to dismiss."); *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 825 (7th Cir.

2015) ("[A] party generally forfeits an argument or issue not raised in response to a motion to dismiss … ."). And Defendants have forfeited any argument for claim preclusion on claims arising from 2017 conduct, as well as on the constructive discharge, ADEA, CBA, and *Shakman* claims, which were not brought in *Outley I. See McGhee v. Dittmann*, 794 F.3d 761, 769 n.16 (7th Cir. 2015) ("[B]ecause the State concedes that it is not arguing procedural default, we consider the issue waived.").

Outley contends that the *Outley I* judgment is not final because it "did not dispose of all issues raised in *Outley I*" and "does not include the final judgment language." Doc. 101 at 3. That contention fails. Under federal law, final judgment is entered when litigation on the merits ends and there is "nothing for the district court to do but execute the judgment," *West v. Louisville Gas & Elec. Co.*, 920 F.3d 499, 503 (7th Cir. 2019)—in other words, when "the district court has finished with the case," *Chase Manhattan Mortg. Corp. v. Moore*, 446 F.3d 725, 726 (7th Cir. 2006). Critically here, a district court need not "use certain magic words" to enter a final judgment, *Paganis v. Blonstein*, 3 F.3d 1067, 1071 (7th Cir. 1993), and the possibility that a party will appeal does not affect a judgment's finality, *see Ross ex rel. Ross*, 486 F.3d at 284 ("[T]he fact that an appeal was lodged does not defeat the finality for preclusion purposes also.").

It is plain from the docket in *Outley I* that final judgment was entered there. *See Parungao v. Cmty. Health Sys., Inc.*, 858 F.3d 452, 457 (7th Cir. 2017) ("[W]hen it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are [precluded] as a matter of law, dismissal is appropriate. Courts may take judicial notice of court filings and other matters of public record when the accuracy of those documents reasonably cannot be questioned.") (internal quotation marks and citations omitted).

Judge Lefkow granted summary judgment against Outley on all his claims and entered final judgment in accordance with Rule 58(a)(4). No. 13 C 1583, Docs. 204-205 (Jan. 11, 2019). Outley timely moved to alter or amend the judgment under Rule 59, *id.*, Doc. 209 (Jan. 22, 2019), thereby "suspend[ing] the finality of the judgment until the district court … acted." *Hall v. Life Ins. Co. of N. Am.*, 317 F.3d 773, 775 (7th Cir. 2003).

Judge Lefkow granted in part and denied in part Outley's Rule 59(e) motion. *Outley I*, Doc. 220 (Mar. 1, 2019). Given that ruling, it is beyond dispute that the district court is finished with *Outley I*. *See West*, 920 F.3d at 503; *Chase Manhattan*, 446 F.3d at 726. The fact that Judge Lefkow did not enter an amended Rule 58 judgment is immaterial to the finality of the *Outley I* judgment. Even if Rule 58(a) required that a separate Rule 58 amended judgment be entered, the *Outley I* judgment would still be final because 150 days have passed since Judge Lefkow ruled on the reconsideration motion. *See Calumet River Fleeting, Inc. v. Int'l Union of Operating Eng'rs, Local 150, AFL-CIO*, 824 F.3d 645, 650 (7th Cir. 2016) ("When a judgment is not set forth on a separate document but Rule 58(a) requires it, we treat judgment as entered 150 days after the entry of the judgment or order on the civil docket.") (citing Fed. R. Civ. P. 58(c)(2)(B)).

The only remaining question is whether that final judgment precluded any claims in the present suit brought against Conner and Mussen, defendants here but not in *Outley I*. Defendants contend that the preclusive effect of *Outley I* extends to claims against Conner and Mussen because both are in privity with the defendants in *Outley I*. As to Conner, Defendants maintain that he currently holds the position previously held by Powers, the former DWM Commissioner and a defendant in *Outley I*. Doc. 91 at 6; *see also Outley I*, No. 13 C 1583, Doc. 118 at 1 (filed Aug. 24, 2016). Defendants make an analogous argument concerning Mussen, who currently

holds the same position as Mazur, Outley's former immediate superior and a defendant in *Outley I. Ibid.* But Defendants do not cite any authority supporting their position or even set forth the test for deciding whether two parties are in privity. Doc. 91 at 4 n.1, 6. Accordingly, their argument is forfeited. *See Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 668 n.3 (7th Cir. 2008) ("We have made it clear that a litigant who fails to press a point by supporting it with pertinent authority … forfeits the point.") (internal quotation marks omitted); *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) ("Perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (internal quotation marks omitted).

In sum, Outley's Title VI, Title VII, and §§ 1981 and 1983 claims, other than those against Conner and Mussen, are precluded to the extent that they arise from pre-2017 conduct. The claims not barred by claim preclusion are: (1) Outley's claims against Conner and Mussen; (2) Outley's Title VI, Title VII, and §§ 1981 and 1983 claims against the City and Stark arising from 2017 conduct; and (3) Outley's constructive discharge, ADEA, CBA, and *Shakman* claims.

## II.     Statute of Limitations

A plaintiff in Illinois who wishes to bring a Title VII claim must first file an administrative charge with the EEOC within 300 days of the alleged unlawful employment practice. *See* 42 U.S.C. § 2000e-5(e); *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 463 (7th Cir. 2016); *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 839 (7th Cir. 2014). Failure to file a charge within that time renders the claim untimely. *See Boston*, 816 F.3d at 463. The same rules apply to ADEA claims. *See* 29 U.S.C. § 626(d)(1)(B); *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 637 (7th Cir. 2004); *Casteel v. Exec. Bd. of Local 703 of the Int'l Bhd. of Teamsters*, 272 F.3d 463, 466 (7th Cir. 2001). Defendants argue that because Outley waited

until August 18, 2017 to file an EEOC charge that pressed the claims raised in this case, he cannot bring any Title VII or ADEA claims arising from pre-October 22, 2016 conduct. Doc. 91 at 8-10. Outley responds that the continuing violation doctrine allows him to bring claims based on such conduct. Doc. 101 at 6-8. Defendants reply that under *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101 (2002), the continuing violation doctrine does not apply. Doc. 104 at 4-5.

In *Morgan*, the Supreme Court held that the continuing violation doctrine does not apply to "discrete" and easily identifiable acts "such as … failure to promote," even if those acts are related to earlier discriminatory or retaliatory acts over a continuous period. 536 U.S. at 110-114. Thus, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act." *Id*. at 113. By contrast, hostile work environment claims involve the accumulation of repeated conduct over time, and thus "[i]n order for [a] charge [alleging hostile work environment] to be timely, the employee need only file [it] within … 300 days of any act that is part of the hostile work environment." *Id*. at 118; *see also Bass*, 746 F.3d at 839 (discussing the distinction between discrete and cumulative violations). Although *Morgan* considered continuing violations in a Title VII case, the Seventh Circuit has applied the doctrine in other statutory contexts, *see, e.g.*, *Turley v. Rednour*, 729 F.3d 645, 651 (7th Cir. 2013) (§ 1983); *Pruitt v. City of Chicago*, 472 F.3d 925, 927 (7th Cir. 2006) (§ 1981), and other courts have applied it to ADEA claims, *see Moses v. Dassault Falcon Jet-Wilmington Corp.*, 894 F.3d 911, 920 (8th Cir. 2018); *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 239-240 (2d Cir. 2007); *Sharpe v. Cureton*, 319 F.3d 259, 267 n.6 (6th Cir. 2003); *Vesprini v. Shaw Contract*

*Flooring Servs., Inc.*, 315 F.3d 37, 41 n.4 (1st Cir. 2002); *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1291 (11th Cir. 2002).

Under *Morgan*, failures to promote are discrete acts. *See Adams v. City of Indianapolis*, 742 F.3d 720, 730 (7th Cir. 2014) (rejecting the plaintiff's argument that successive failures to promote over several years were continuing violations, reasoning that "[t]he employment actions challenged here fall squarely within the Supreme Court's list of discrete acts—they are failures to promote") (quoting *Morgan*, 536 U.S. at 114). Denials of working-up-in-grade and overtime opportunities are as well. *See Jackson v. City of Chicago*, 552 F.3d 619, 624 (7th Cir. 2009) ("The acting-up decisions [i.e., working-up-in-grade opportunities] were discrete acts which could be considered only if they occurred within the appropriate time period covered by his EEOC charge."); *Tillman v. S. Wood Preserving of Hattiesburg, Inc.*, 377 F. App'x 346, 349 (5th Cir. 2010) ("[T]he denials of weekend overtime qualify as … discrete acts."). Hostile work environment claims, by contrast, are continuing violations. *See Adams*, 742 F.3d at 730 ("The Court [in *Morgan*] distinguished claims involving discrete acts of discrimination from claims alleging a hostile work environment: Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct.") (internal quotation marks omitted) (quoting *Morgan*, 536 U.S. at 116). Defendants have put forward no argument or authority showing that the hostile work environment component of Outley's claims is time-barred under *Morgan*, thereby forfeiting the point. *See Lee*, 912 F.3d at 1054; *Windy City Metal Fabricators*, 536 F.3d at 668 n.3.

Accordingly, Outley's ADEA and Title VII claims, other than those based on his hostile work environment allegations, are barred to the extent that they challenge pre-October 22, 2016 conduct.

## III.     Section 1981 Claim

Defendants move to dismiss Outley's § 1981 claim on the ground that § 1981 does not provide a cause of action against state actors. Doc. 91 at 10. Outley implicitly concedes that he cannot sue a state actor in her official capacity under § 1981, but contends that § 1981 allows him to sue Stark, Conner, and Mussen in their individual capacities. Doc. 101 at 8.

That argument cannot be squared with binding precedent. In *Jett v. Dallas Independent School District*, 491 U.S. 701 (1989), the Supreme Court considered whether a discrimination claim against a school principal in both "his personal and official capacities" could proceed under § 1981. *Id*. at 707. A majority of the Justices held that "the express 'action at law' provided by § 1983 for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws,' provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor." *Id*. at 735. Implementing *Jett*, the Seventh Circuit in *Campbell v. Forest Preserve District of Cook County*, 752 F.3d 665 (7th Cir. 2014), held that "to infer a remedy against state actors under § 1981 would contravene the specific remedy created by Congress under § 1983." *Id*. at 670. The Seventh Circuit added that a 1991 amendment to § 1981 did not abrogate *Jett* and that "§ 1983 remains the exclusive remedy for violations of § 1981 committed by state actors." *Id*. at 671. Although the Seventh Circuit did not say whether the defendant in *Campbell* was sued in his individual or official capacity (or both), its holding that the amendment did not abrogate *Jett*— which concerned a claim against a state actor in both his individual and official capacities— leaves little doubt that a plaintiff cannot sue a state actor in her individual capacity under § 1981. As the Sixth Circuit explained:

> The reasoning of *Jett* is equally applicable to § 1981 suits against state actors sued in their individual capacity. In reaching its holding, a plurality of the

Court relied on the legislative history of § 1981. The plurality observed that prior to § 1983, there was no legislation that provided a federal damages remedy against state actors who violated the law. The Congress that enacted the precursor to § 1983 believed that it was enacting the first and only federal damages remedy against state actors. The Court refused to imply a private right of action under § 1981 in the context of state action—as it had for private action—because unlike in the context of private action, the more specific and express cause of action contained in § 1983 provided a mechanism to address a violation of § 1981. The Court's logic would naturally extend to the context of individual state actors sued in their individual capacity. Whether the violation of § 1981 is committed by a municipality through its policies or custom, or individuals acting under the color of state law, § 1983 contains an express clause permitting an aggrieved person to sue the state actor for money damages. Section 1983's express clause permitting these suits obviates the need to imply the same right under the general provisions of § 1981.

*McCormick v. Miami Univ.*, 693 F.3d 654, 661 (6th Cir. 2012). Thus, Outley may not sue Stark, Conner, and Mussen in their individual capacities under § 1981.

Outley maintains that Stark, Conner, and Mussen are not alleged to have functioned as state actors when they discriminated against him, reasoning that because they "had an intent to discriminate," they were "acting outside of their respective roles as City employees." Doc. 101 at 8 (citing Doc. 55 at ¶¶ 153-155). The Supreme Court long ago considered and rejected the argument that a defendant ceases to act under color of state law for purposes of § 1983 when she violates state law or the constitution in carrying out her duties. *See Monroe v. Pape*, 365 U.S. 167 (1961), *overruled in other part by Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978); *see also Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 929 (1982) ("[I]n a § 1983 action brought against a state official, the statutory requirement of action 'under color of state law' and the 'state action' requirement of the Fourteenth Amendment are identical."). It follows that Outley's § 1981 claim cannot proceed.

## IV.    Section 1983 Claims

The § 1983 claims that survive dismissal on preclusion and limitations grounds are those (1) against Connor and Mussen and (2) against the City and Stark insofar as they arise from 2017 conduct.  "To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934-35 (7th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678).

### A.    Claims Against the City

As for Outley's claims against the City, which arise under the *Monell* doctrine, Defendants argue that Outley does not plausibly allege that the City fostered a widespread practice or custom of employment discrimination in hiring because, while he alleges that the City "has a deliberate and pervasive pattern and practice of systemic and continuing employment discrimination against Black employees," he identifies only four employees over the course of four years who were promoted—too small a sample size to support his claim that employment discrimination is a widespread practice.  Doc. 91 at 14-15.  (Defendants' assertions concerning facts purportedly established in *Outley I* but that do not appear in the complaint here are disregarded, *id*. at 15 n.6, as the court cannot consider them on a motion to dismiss.)  Likewise, Defendants submit that Outley does little more than assert that the hostile work environment claim is part of a larger pattern of discrimination without providing any detail.  *Id*. at 15.

The Seventh Circuit rejected similar arguments in *White v. City of Chicago*, 829 F.3d 837 (7th Cir. 2016).  The plaintiff in *White* alleged that "[i]n accordance with a widespread practice

of the police department of the City of Chicago: [an individual defendant] requested the judge to issue a warrant on the basis of [the defendant's] conclusory allegation that other law enforcement officers claimed or believed plaintiff had committed an offense, and [the defendant] did not present the judge with an affidavit setting out any affirmative allegation of facts that would indicate that plaintiff had committed an offense." *Id*. at 843-44. According to the Seventh Circuit, that allegation, together with allegations concerning the plaintiff's "individual claim against [the individual defendant]" and allegations that the "standard printed form" used to seek warrants "does not require specific factual support for an application for an arrest warrant," satisfied the *Twombly-Iqbal* standard. *Id*. at 844. Crucially, the Seventh Circuit held that the plaintiff was "not required to identify every other or even one other individual who had been arrested pursuant to a warrant obtained through the complained-of process." *Ibid*.

Outley's allegations are comparable to those in *White*. He alleges that the City engaged in a "deliberate and pervasive pattern and practice of systemic and continuing employment discrimination against Black employees," Doc. 55 at ¶ 45; he states individual race discrimination claims, *id*. at ¶¶ 45-58; and he pleads facts tending to draw a connection between his experience and a larger trend, such as alleging that from 1989 until 2015, all men promoted to COE were white even though many qualified African-American men applied, *id*. at ¶ 28. Likewise, Outley alleges that the hostile work environment he experienced "represents a department-wide pattern and practice, rather than a series of isolated incidents," *id*. at ¶ 78; he states individual claims based on the treatment he suffered, *id*. at ¶¶ 59-82; and he pleads facts suggesting that his experience was part of a larger trend, alleging that African-American employees generally were subjected to "racial slurs; conduct of a racial nature; racially motivated jokes; racially insensitive communications … and unwanted verbal and physical

contact based on race," *id*. at ¶ 64.  Outley was not required to identify "every other or even one

other individual who has been" granted or denied a promotion or who was subjected to a hostile

work environment.  *White*, 829 F.3d at 844.  His allegations suffice to state a *Monell* claim.

###    B.    Claims Against the Individual Defendants

Defendants move to dismiss the § 1983 claims against Stark, Conner, and Mussen on the

ground that the complaint does not allege their personal involvement in the constitutional

violations.  Doc. 91 at 16-19.  A government employee may be liable under § 1983 only if the

plaintiff alleges the employee's "personal involvement in the alleged constitutional deprivation,"

meaning that the plaintiff must allege "a causal connection between (1) the sued officials and (2)

the alleged misconduct."  *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017).

Accordingly, § 1983 plaintiffs must "ground [their] legal conclusions in a sufficiently plausible

factual basis" that places each defendant "on notice of what exactly [he or she] might have done

to violate [the plaintiffs'] rights under the Constitution [or] federal law … ."  *Brooks v. Ross*, 578

F.3d 574, 582 (7th Cir. 2009).  "Vague references to a group of 'defendants,' without specific

allegations tying the individual defendants to the alleged unconstitutional conduct," are

insufficient.  *Grieveson v. Anderson*, 538 F.3d 763, 778 (7th Cir. 2008).  A plaintiff can plead

that a supervisor was personally involved in a constitutional violation by alleging that she

"kn[e]w about the conduct and facilitate[d] it, approve[d] it, condone[d] it, or turn[ed] a blind

eye for fear of what [she] might see … in other words [that she] act[ed] either knowingly or with

deliberate, reckless indifference."  *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir.

1988); *see also Sides v. City of Champaign*, 496 F.3d 820, 827 (7th Cir. 2007) (similar).

Defendants argue that Conner could not have been personally involved in any conduct

that occurred before June 28, 2017, when he was appointed DWM Commissioner.  Doc. 91 at

18.  Outley responds that Conner began working at DWM well before his official appointment. Doc. 101 at 12.  As Outley's factual assertion regarding when Conner began work at DWM is not inconsistent with the complaint, the court must accept it as true and, having done so, must reject Defendants' argument that Conner cannot be held liable for pre-June 28, 2017 conduct. *See Phillips*, 714 F.3d at 1020.

As to Stark, Defendants contend that Outley does not "allege a single specific fact alleging Stark's specific involvement in his alleged constitutional deprivation."  Doc. 91 at 18. But the complaint alleges that because of Outley's race, Defendants intentionally denied him promotions to COE and that they did so by manipulating the application and testing process to ensure that African-American employees were not promoted.  Doc. 55 at ¶¶ 34, 48-49.  The complaint further alleges that the "designing, administration and grading of the test are totally within the control of the … City" through DHR and its employees, "including Stark"; that Stark was on the interview panel for the test; that Stark had "ultimate policy making authority over promotions" and was "required to approve promotions"; and that Stark was "ultimately responsible for … [Outley's] denial of promotion" because he "knew what was going on within the DWM in its systemic denial of promotions … to Blacks in general and Outley in particular and failed and/or refused to act in any manner to stop the improper conduct."  Doc. 55 at ¶¶ 36, 39, 122, 132.  In other words, Outley alleges how Stark was involved in and responsible for hiring decisions.  Nothing more is required at the pleading stage to allege Stark's personal involvement.  *See Hildebrandt v. Ill. Dep't of Nat. Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003) (holding that a reasonable jury could find that a defendant was personally involved in a discriminatory raise where there was evidence that the person who made the decision always discussed it with the defendant and solicited his changes and comments).  It may be true that

there are some constitutional deprivations described in the complaint in which Stark is not alleged to have been personally involved, but as Defendants make no effort to specify those deprivations, they forfeit the point for purposes of the present motion. *See M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived … .").

Next, Defendants argue that Mussen cannot be held liable under § 1983 for any promotion decisions, reasoning that while the complaint alleges that Mussen was himself promoted in a discriminatory way, it does not allege that he was involved in any discriminatory promotion decisions. Doc. 91 at 18-19. Outley cites one paragraph of the complaint to support his contention that Mussen was involved in promotion decisions, but that paragraph has nothing to do with promotions. Doc. 101 at 13 (citing Doc. 55 at ¶ 66). Thus, Outley does not sufficiently allege Mussen's personal involvement in any promotion decisions.

Defendants also contend that Mussen cannot be held liable under § 1983 for creating a hostile work environment because the allegations against him, considered alone, do not make out a hostile work environment claim. But Outley's hostile work environment claim is based not just on Mussen's actions, but on an accumulation of acts committed by Mussen and others. *See Alamo v. Bliss*, 864 F.3d 541, 551 (7th Cir. 2017) (rejecting the defendant's attempt to pick apart individually the allegations that made up a hostile work environment claim, observing that "the Supreme Court's standard [for hostile work environment claims under § 1983] … requires that we consider the *totality* of Mr. Alamo's factual allegations and the work environment in which they happened"). Defendants do not argue that Outley's allegations taken together are insufficient to state a hostile work environment claim, nor do they offer argument or authority for

the proposition that Mussen cannot be held liable for his contribution to the larger whole. That

argument is therefore forfeited for purposes of this motion. *See M.G. Skinner*, 845 F.3d at 321.

## V. Title VI Claim

Defendants contend that 42 U.S.C. § 2000d-3 bars Outley's Title VI claims. Doc. 91 at

19-22. Section 2000d-3 provides that Title VI may not be construed "to authorize action … by

any department or agency with respect to any employment practice of any employer,

employment agency, or labor organization except where a primary objective of the Federal

financial assistance is to provide employment." 42 U.S.C. § 2000d-3. The provision was

enacted out of "concern that the receipt of any form of financial assistance might render an

employer subject to the commands of Title VI rather than Title VII." *Johnson v. Transp.

Agency, Santa Clara Cnty.*, 480 U.S. 616, 627 n.6 (1987). In *Ahern v. Board of Education of

City of Chicago*, 133 F.3d 975 (7th Cir. 1998), the Seventh Circuit interpreted the provision to

limit employment discrimination claims under Title VI to cases in which "(1) providing

employment is a primary objective of the federal aid, or (2) discrimination in employment

necessarily causes discrimination against the primary beneficiaries of the federal aid." *Id*. at 978.

Outley does not argue that his allegations concerning the federal funding that the City

receives, Doc. 55 at ¶¶ 177-179, satisfy either prong of *Ahern*. Doc. 101 at 15 ("Plaintiff need

not plead or prove that the federal financial assistance received by City and or the Water

Department was assistance intended to provide employment."). Instead, Outley cites *Irving v.

Pui Tak Center*, 2013 WL 2251757, at *4 (N.D. Ill. May 22, 2013), for the proposition that while

his claim might have been excluded under a previous version of Title VI, the current and broader

version of Title VI encompasses his claim. That argument fails for two reasons.

First, *Irving* has nothing to do with discrimination claims or § 2000d-3, and the broadening of Title VI it discusses implicates neither. Rather, *Irving* held that Congress broadened Title VI to apply not just to the particular programs that receive federal funds, but to all operations of the organizations that administer programs that receive federal funds. *Id*. at *4-6. Section 2000d-3 does not concern whether Title VI applies at the programmatic or organizational level; instead, it bars plaintiffs from pursuing employment discrimination claims against organizations that otherwise would be subject to liability under Title VI. Thus, *Irving* did not hold that Congress broadened Title VI to cover employment discrimination claims that do not satisfy *Ahern*.

Second, the Seventh Circuit's decision in *Ahern* post-dated the broadening of Title VI discussed in *Irving*. The amendment to Title VI was enacted in 1988 as part of the Civil Rights Restoration Act ("CRRA"). *See ibid*. (citing *Hodges by Hodges v. Pub. Bldg. Comm'n of Chi.*, 864 F. Supp. 1493, 1504 (N.D. Ill. 1994)); *Hodges*, 864 F. Supp. at 1505 ("The landscape of Title VI changed in 1988 when Congress overruled the *Grove City* decision's narrow reading by passing the [CRRA], Pub. L. No. 100–259, codified under 42 U.S.C. § 2000d–4a. The CRRA reinstates a broader concept of 'program or activity' by adding to Title VI an explicit definition for that phrase[.]"). The Seventh Circuit issued *Ahern* ten years later, meaning that the CCRA could not have abrogated *Ahern*; rather, *Ahern* interpreted Title VI as amended. Thus, even if *Irving* held that the CRRA broadened Title VI's scope to include Outley's claims, the court would be bound to follow *Ahern*—under which Outley's claims cannot be brought under Title VI. *See Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004) ("In a hierarchical system, decisions of a superior court are authoritative on inferior courts. Just as the court of appeals must follow decisions of the Supreme Court whether or not we agree with them,

so district judges must follow the decisions of this court whether or not they agree.") (citations omitted); *A Woman's Choice-E. Side Women's Clinic v. Newman*, 305 F.3d 684, 687 (7th Cir. 2002) ("[O]nly an express overruling relieves an inferior court of the duty to follow decisions on the books.").

Outley's Title VI claim accordingly is dismissed.

## VI.    CBA Claim

Defendants move to dismiss Outley's CBA claim on the ground that he lacks standing to enforce the CBA. Doc. 91 at 22-23. In so doing, Defendants ask the court to take judicial notice of the CBA, which is reproduced on the City's website. Doc. 91 at 22 n.9; Fed. R. Evid. 201(c)(2). The motion is granted. *See Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 648 (7th Cir. 2011) ("We have recognized the authority of a court to take judicial notice of government websites."); *Minch v. City of Chicago*, 486 F.3d 294, 300 n.3 (7th Cir. 2007) (holding that the court could consider a CBA on a motion to dismiss where, as here, the plaintiff's claims rested on the CBA and the plaintiff did not contest its use).

The Illinois Public Labor Relations Acts ("IPLRA") "regulate[s] labor relations between public employers and employees, including … resolution of disputes arising under collective bargaining agreements." 5 ILCS 315/2. The IPLRA requires that every CBA "contain a grievance resolution procedure which shall apply to all employees in the bargaining unit and shall provide for final and binding arbitration of disputes concerning the administration or interpretation of the agreement unless mutually agreed otherwise." 5 ILCS 315/8. The CBA governing Outley's employment provided that employee grievances would be settled by binding arbitration. *See* Collective Bargaining Agreement Between International Union of Operating Engineers, Local 399 and City of Chicago 60-70, City of Chicago,

https://www.chicago.gov/content/dam/city/depts/dol/Collective%20Bargaining%20 Agreement2/BU12OPERENGRLOCAL399.pdf (last visited Aug. 28, 2019).  Lawsuits based on conduct underlying a grievance may be brought only after arbitration is exhausted and, critically here, only by the "parties to such agreement."  5 ILCS 315/16.  Because the parties to a CBA are the employer and the union, not the individual employees represented by the union, individual employees lack standing to sue under the CBA unless the union breaches its duty of fair representation ("DFR").  *See Cleveland v. Porca Co.*, 38 F.3d 289, 296-97 (7th Cir. 1994) ("The plaintiffs lack standing to enforce the arbitration award, however, because when employees are represented by a union they are not parties to either the [CBA] or any union-company arbitration. They therefore generally cannot challenge, modify, or confirm the award in court.  An exception to this general rule exists which allows employees to challenge or confirm a union-company arbitration award *but only if* the employees state a claim for a Section 301 fair representation case and the challenge or confirmation is integral to the case.") (internal quotation marks and citations omitted); *Shores v. Peabody Coal Co.*, 831 F.2d 1382, 1383 (7th Cir. 1987) (same); *Anderson v. Norfolk W. R.R. Co.*, 773 F.2d 880, 882 (7th Cir. 1985) (same); *Matthews v. CTA*, 51 N.E.3d 753, 766 (Ill. 2016) ("[O]nly parties to a CBA may dispute an arbitration award in court. Thus, only the employer and the designated representative of the bargaining unit may bring suit to challenge an arbitration award in circuit court.") (internal citations omitted); *Stahulak v. City of Chicago*, 703 N.E.2d 44, 46-47 (Ill. 1998) ("In this case, the City and the Union are parties to the agreement, but [the plaintiff] as an individual is not.  [A]n individual employee is not entitled to judicial review of a grievance proceeding or arbitration unless the employee can show that his union's conduct in processing the grievance was arbitrary, discriminatory, or in bad faith.") (internal citations omitted).

Outley does not dispute those principles or develop an argument showing that the complaint's allegations suffice to allow his CBA claim to move forward. Instead, Outley seeks leave to amend his complaint again to add a claim for breach of his union's DFR obligations. Doc. 101 at 16-17. In opposing any such amendment, Doc. 104 at 9, Defendants observe that they made the same argument for dismissing Outley's CBA claim in their prior motion to dismiss, even alerting him to the possibility that he could enforce the CBA if he showed that his union breached its DFR. Doc. 24 at 19-21 ("Courts have recognized that in rare circumstances, an employee can have standing to enforce a CBA, if the union's conduct in processing the grievance was arbitrary, discriminatory, or in bad faith, to the point that the Union breached its duty of good faith and fair representation."). In his response to that argument, Outley stated that "courts have recognized employee standing to enforce a Collective Bargaining agreement where improper conduct has been plead[ed] in the Complaint" and sought leave to amend his complaint to allege that conduct. Doc. 41 at 13. The court granted such leave, Doc. 50, but Outley did not follow through in his amended complaint.

The court will not now grant Outley leave to add the very DFR allegations he successfully moved for leave to add—but did not add—in his response to Defendants' prior motion to dismiss. A plaintiff ordinarily is given at least one opportunity to amend, *see Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 941 (7th Cir. 2018), but is not entitled to additional opportunities if she fails to remedy defects apparent at the time of the prior amendment. *See Arington v. Norton*, 751 F. App'x 934, 936 (7th Cir. 2019) ("[A]fter granting a plaintiff a chance to amend, as the district court did here, a district court may deny further amendments based on the previous failure to cure deficiencies.") (internal quotation marks omitted); *Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 855 (7th Cir. 2017) (affirming

the district court's denial of leave to amend to assert an ADA claim where the plaintiff "could have alleged the ADA claim at the beginning of the suit" and "[t]he lengthy delay could not be justified by newly discovered information"). Permitting Outley to amend to rectify previously known and fatal flaws in his CBA claim would prejudice Defendants by "forcing them to articulate [additional] reasons for dismissal, and, at the same time providing [Outley] with the opportunity to correct mistakes facially apparent since the first complaint after the defendants had shown their hand." *Thompson v. Ill. Dep't of Prof'l Regulation*, 300 F.3d 750, 759 (7th Cir. 2002); *see also King v. Schieferdecker*, 498 F. App'x 576, 579 (7th Cir. 2012) ("Prejudice or delay sufficient to justify the denial [of leave to amend] can occur when the plaintiff has already received a chance to amend his complaint to fix flaws cited in a motion to dismiss, but failed to do so.").

Accordingly, the court dismisses Outley's CBA claim and denies him leave to amend.

## VII. *Shakman* Claim

Defendants move to dismiss the *Shakman* claim on two grounds. First, they contend that the claim is time-barred, as the June 14, 2014 order in the *Shakman* case terminating the *Shakman* Accord provided that claims under the Accord could proceed only if they were filed within 180 days of the termination, well before this suit was filed in November 2017. Second, Defendants argue the Accord prohibits only politically-motivated employment discrimination, not the race- and age-based discrimination alleged by Outley. Doc. 91 at 23-24. Outley does not respond to the first argument, and rather than defending the sufficiency of his complaint against the second argument, he seeks leave to amend to allege that he suffered adverse employment actions because "he did not have the right 'clout,' meaning he was not politically connected to the right people." Doc. 101 at 16.

By failing to address Defendants' argument that *Shakman* claims may proceed only if they were filed within 180 days of July 14, 2014, Outley has forfeited his *Shakman* claim. Accordingly, the claim is dismissed, and leave to amend is denied on futility grounds.

## VIII.  Constructive Discharge Claim

Defendants move to dismiss the constructive discharge claim on the ground that the incident between Mussen and Outley in Outley's car cannot, standing alone, support the claim, and that Outley's remaining allegations are too vague and conclusory to meet the *Twombly-Iqbal* plausibility requirement.  Doc. 91 at 24-26.

The Seventh Circuit considered and rejected a similar argument in *Carlson v. CSX Transportation, Inc.*, 758 F.3d 819 (7th Cir. 2014).  The plaintiff in *Carlson* alleged that after she filed a lawsuit challenging discriminatory promotion practices and began negotiations to settle the claims, her superiors—who were aware of the lawsuit—constructively discharged her by "belittling her, assigning her extra work, and giving her unjustifiably poor evaluations." *Id*. at 823.  The district court held that "her allegations of regular belittlement, unfair criticism, and unduly poor assessments" were too "conclusory" to support her constructive discharge claim and that her complaint did not allege "evidence of intolerable working conditions." *Id*. at 829.  In reversing, the Seventh Circuit held that "[e]ven if a[n employment discrimination] claim might theoretically be too 'conclusory'—a theory hard to square with [Seventh Circuit precedent], at least where the situation is identified and unlawful motivation alleged"—the plaintiff satisfied the plausibility threshold by "includ[ing] specific examples of poor treatment." *Id*. at 830.  The court further held that the plaintiff was not required to plead "evidence" that her working conditions were intolerable. *Ibid*.; *see also Huri v. Office of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 834 (7th Cir. 2015) ("[I]t is premature at the pleadings stage to

conclude just how abusive Huri's work environment was. It is enough to say that it is plausible that the screaming, prayer circles, social shunning, implicit criticism of non-Christians, and uniquely bad treatment of Huri and her daughter could plausibly be abusive.").

Outley's claim survives dismissal for similar reasons. Defendants concede that allegations of severe discriminatory harassment that makes working conditions intolerable can support a constructive discharge claim. Doc. 91 at 25 (citing *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010)). That is precisely what Outley alleges here: that "the hostile, abusive and negative work environment during his day-to-day activities," culminating in his confrontation with Mussen, made for "intolerable working conditions" that resulted in his resignation. Doc. 55 at ¶¶ 119-120. The complaint alleges many instances of poor treatment, including that Outley's "co-workers, supervisors, and DWM leadership, including … Mussen and Stark" "humiliated, harassed and threated" him on a daily basis, Doc. 55 at ¶ 69; that unfounded charges were brought against him, *id*. at ¶ 66; that Mussen, Stark, and Conner allowed racist emails, screen savers, posters, cartoons, and graffiti in the pumping stations, *id*. at ¶ 63; and that no action was taken to discipline Mussen or even to investigate Outley's workplace violence complaint, *id*. at ¶¶ 108-111. Outley further alleges that his ill treatment was on account of his race or in retaliation for speaking out about racially discriminatory treatment. *Id*. at ¶¶ 59, 64, 66, 68. Those allegations are sufficient under *Carlson* to survive dismissal.

## Conclusion

Defendants' motion to dismiss is granted in part and denied in part. Outley's claims under § 1981, the CBA, the *Shakman* Accord, and Title VI are dismissed in their entirety. Outley's § 1983 claims against the City and Stark, and his Title VII claim except for its hostile work environment component, are dismissed to the extent that they arise from pre-2017 conduct.

Outley's ADEA claim is dismissed to the extent that arises from pre-October 22, 2016 conduct, except for its hostile work environment component, which may proceed in its entirety. Outley's § 1983 claims against Mussen are dismissed to the extent they are based on promotion decisions. And Outley's requests for leave to amend his CBA and *Shakman* claims are denied. These claims remain: (1) the § 1983 claims against Conner; (2) the § 1983 claims against Mussen as to conduct unrelated to promotion decisions; (3) the Title VII claims as to hostile work environment and otherwise as to post-2017 conduct; (4) the ADEA claim as to hostile work environment and otherwise as to post-October 22, 2016 conduct; and (5) the constructive termination claim.

September 9, 2019

_____
United States District Judge