UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL OUTLEY, | ) | |
| | ) | |
| Plaintiff, | ) | 17 C 8633 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| THE CITY OF CHICAGO, ALAN STARK, RANDY | ) | |
| CONNER, and ROBERT MUSSEN, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In a previous lawsuit, Michael Outley sued the City of Chicago and three officials of its

Department of Water Management ("DWM")—then-Commissioner Thomas Powers, Deputy

Commissioner Alan Stark, and Chief Operating Engineer Paul Mazur—alleging violations of 42

U.S.C. §§ 1981 and 1983, Titles VI and VII of the Civil Rights Act of 1964, 42 U.S.C.

§§ 2000d-2000e *et seq.*, and Illinois common law.  *Outley v. City of Chicago*, No. 13 C 1583

(N.D. Ill.) ("*Outley I*") (Lefkow, J.), ECF No. 118.  The district court in that suit granted

summary judgment to the defendants.  *Id.*, ECF Nos. 204-205 (reported at 354 F. Supp. 3d 847

(N.D. Ill. 2019)).  The court later amended the judgment to clarify that the suit did not resolve

any claims arising from Outley's failure to receive a promotion in 2017.  *Id.*, ECF No. 220, at 2.

In the present suit, Outley brought claims against the City, Stark, and two other DWM

officials—Commissioner Randy Conner and Chief Operating Engineer Robert Mussen—alleging

violations of 42 U.S.C. §§ 1981 and 1983, Titles VI and VII, the Age Discrimination in

Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, his union's collective bargaining

agreement, and the *Shakman* Accord.  Doc. 55.  (Docket entries in this suit are cited as Doc. __,

while docket entries in *Outley I* are cited as *Outley I*, ECF No. __.)  On Defendants' Rule

1

12(b)(6) motion, the court dismissed Outley's Title VI and § 1981 claims and his claims for breach of the collective bargaining agreement and the *Shakman* Accord. Docs. 112-113 (reported at 407 F. Supp. 3d 752 (N.D. Ill. 2019)). The court also dismissed parts of Outley's Title VII, ADEA, and § 1983 claims on claim preclusion and timeliness grounds. 407 F. Supp. 3d at 759-62.

With discovery closed, Outley moves for summary judgment as to liability on the hostile work environment and constructive discharge components of his Title VII claim, his § 1983 claim against Mussen, and his ADEA claim. Doc. 215. Defendants cross-move for summary judgment on all claims that survived dismissal under Rule 12(b)(6). Doc. 220. Defendants' motion is granted as to all claims except the Title VII hostile work environment claim against the City and related § 1983 claim against Mussen, and Outley's motion is denied.

## Background

Because the parties cross-move for summary judgment, the court ordinarily would view the disputed facts in the light most favorable to Defendants when considering Outley's motion and in the light most favorable to Outley when considering Defendants' motion. *See First State Bank of Monticello v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 567 (7th Cir. 2009) ("[B]ecause the district court had cross-motions for summary judgment before it, we construe all facts and inferences therefrom in favor of the party against whom the motion under consideration is made.") (internal quotation marks omitted). But because the court will largely grant Defendants' motion and deny Outley's, the facts are set forth as favorably to Outley as the record and Local Rule 56.1 permit. *See Garofalo v. Vill. of Hazel Crest*, 754 F.3d 428, 430 (7th Cir. 2014). At this juncture, the court must assume the truth of those facts, but does not vouch for them. *See Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 633 (7th Cir. 2019).

In its Rule 12(b)(6) opinion, the court held that the preclusive effect of the *Outley I* judgment and the applicable statutes of limitations imposed temporal limits on Outley's remaining claims. 407 F. Supp. 3d at 759-62. As for claim preclusion, the court held that Outley's § 1983 claim against Stark and Title VII claims were "precluded to the extent that they arise from pre-2017 conduct." *Id*. at 761. That language was imprecise, as the correct cut-off date for claim preclusion is August 24, 2016, not December 31, 2016. Claim preclusion based on a judgment entered in a prior suit bars only those claims that arose before the operative complaint in that suit was filed. *See Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 652 (7th Cir. 2011) ("[C]laim preclusion generally does not bar a subsequent lawsuit for issues that arise after the operative complaint is filed."). Outley filed the operative complaint in *Outley I* on August 24, 2016. *Outley I*, ECF No. 118. Accordingly, for the reasons given in the court's Rule 12(b)(6) opinion, Outley may not premise his § 1983 claim against Stark or any Title VII claim, including his hostile work environment claim, on events that took place before August 24, 2016.

The statute of limitations imposes additional restrictions on Outley's Title VII and ADEA claims. As the court explained in its Rule 12(b)(6) opinion, and with one exception, because Outley filed his EEOC charge on August 18, 2017, he cannot bring any Title VII or ADEA claim arising from conduct or events that took place before October 22, 2016. 407 F. Supp. 3d at 761. The exception is that no part of his Title VII hostile work environment claim is barred by the statute of limitations, *ibid*. (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118 (2002)), so that claim can rest on events as early as August 24, 2016. In sum, Outley's § 1983 claims and the hostile work environment component of his Title VII claim may be premised only on events that took place on or after August 24, 2016, and his ADEA claim and the other

components of his Title VII claim may be premised only on events that took place on or after October 22, 2016.

### A.     General Background

Outley, a Black man born in 1955, started working for the City in 1987.  Doc. 239 at ¶¶ 1-3.  In 1993, Outley joined DWM—the department responsible for delivering water to Chicago residents—and was assigned to the Lexington Pumping Station.  Doc. 242 at ¶ 9; Doc. 239 at ¶ 5; Doc. 119 at ¶ 18.  DWM employees in the positions of Chief Operating Engineer ("COE") and Assistant Chief Operating Engineer ("ACOE") oversee the operations of pumping stations.  Doc. 119 at ¶¶ 23, 26.  Outley was promoted to ACOE at Lexington in 1998.  Doc. 239 at ¶ 6.  He remained in that role until he left the City's employ on August 1, 2017.  *Id*. at ¶¶ 7-8.

Conner was the Commissioner of DWM from June 2, 2017 until he retired in 2020, so he served as Commissioner during the final two months of Outley's employment.  Doc. 242 at ¶ 3.  Stark was the Deputy Commissioner of DWM from September 1, 2011 until he retired in August 2018.  *Id*. at ¶ 5.  Mussen was an ACOE from 2006 to 2015, when he was promoted to COE and assigned to the Lexington Pumping Station, becoming Outley's direct supervisor.  *Id*. at ¶ 7; Doc. 239 at ¶¶ 39-40.

Outley filed administrative charges with the EEOC in 2012 and 2013 alleging race discrimination by the City.  Doc. 239 at ¶¶ 19-20.  As noted, Outley filed another EEOC charge in mid-August 2017, shortly after he left the City's employ, which provides the basis for administrative exhaustion in this suit.  *Id*. at ¶ 53.

### B.     2017 Failure to Promote

In 2017, Outley applied for a promotion to COE, but DWM chose to promote John Murphy, who is white, and Katherine Ealy, who is Black.  Doc. 242 at ¶¶ 25-26.  Ealy had less

seniority than Outley.  Doc. 239 at ¶ 23.  Although Outley initially asserted that Ealy turned 40

years old in 2017, Doc. 216 at ¶ 22; Doc. 241 at 11, he later acknowledged that Ealy was around

50 years old at that time.  Doc. 255 at 13.

DWM used a two-part process, a written test followed by an interview, to determine

which candidate to promote to COE.  Doc. 242 at ¶ 21.  The written test pertinent to this case

was administered on May 23, 2017.  Doc. 226-1 at 16-18.  On the first part of the test, Outley

received a score of 61, while Ealy and Murphy scored 58, and on the second part of the test,

Outley answered 16 out of 20 questions correctly, while Ealy and Murphy answered 15 questions

correctly.  *Id*. at 18-19.

The nine candidates who passed the written test were interviewed on July 7 and July 10,

2017.  Doc. 242 at ¶ 21; Doc. 226-1 at 19; Doc. 228-1 at 53.  Each candidate except for Outley

was interviewed by both Andre Holland and Mark Henmueller.  Doc. 242 at ¶ 24; Doc. 228-1 at

54.  Henmueller asked Stark to be recused from Outley's interview because Henmueller was

concerned that he could be a witness in Outley's then-pending lawsuit (*Outley I*).  Doc. 243-1 at

3.  Stark granted that request, and Daryl Materre subbed in for Henmueller, such that Outley was

interviewed by Holland and Materre.  *Ibid*.; Doc. 242 at ¶ 24.

Holland and Materre are Black.  Doc. 242 at ¶ 24.  Neither individual made comments

about Outley's race during the interview, Doc. 222-12 at 10:6-10, and Outley did not hear

anyone make age-related remarks to him, Doc. 242 at ¶ 59.  Outley testified, however, that in

prior interviews, Materre gave him worse assessments than those he received from white

interviewers.  Doc. 222-12 at 9:23-10:1.

After the interviews concluded, the officials involved in hiring held a "consensus

meeting" to discuss which candidates were best suited for the COE role.  Doc. 242 at ¶ 22.

Martin Wise, a recruiter from the City's human resources department, took notes at the meeting. Doc. 222-9 at ¶ 1; Doc. 242 at ¶ 15; Doc. 228-1 at 54-55.

Defendants assert that Outley gave incomplete and inaccurate answers during the interview, citing Wise's declaration averring to that fact. Doc. 222 at ¶ 27. Wise's contemporaneous notes from the consensus meeting corroborate his declaration. Materre remarked that Outley did not understand the "function of [a] jet ejector," "gave an abstract definition of what a condenser is," and "didn't fully answer the [third] question." Doc. 228-1 at 54. Holland commented that Outley "didn't understand what a condenser did" and "didn't explain clearly" an issue related to steam valves. *Ibid.* Outley disputes that he gave incomplete and inaccurate answers, pointing to his testimony that Materre, as compared to white interviewers, had in the past been unfairly critical of him. Doc. 242 at ¶ 27. Outley also points to his testimony that Holland and Materre ended the interview abruptly without "formality" and "etiquette." *Ibid.*; Doc. 222-12 at 10:12-11:16. But the testimony cited by Outley does not specifically address or rebut Defendants' assertion, supported by the cited portions of the record, that he gave incomplete and inaccurate answers during his interview, so that fact is undisputed.

The hiring officials at the consensus meeting decided to recommend Murphy and Ealy as the most qualified candidates for promotion to COE. Doc. 228-1 at 52. Wise's notes stated that Murphy "[h]it dead on on a lot of stuff" and "explained [question] #2 well," and that Ealy displayed "knowledge of condensers," knew "what a jet-valve was," and "underst[ood] what to do." *Id.* at 54.

In their Local Rule 56.1(a)(2) statement, Defendants assert that candidates who receive a passing score on the test and possess the qualifications best suited for the COE role are thereafter selected in order of seniority. Doc. 222 at ¶ 23. Defendants cite a sworn declaration from Jill

May, a human resources employee, to support that assertion. *Ibid.*; Doc. 222-8 at p. 5, ¶ 8. Outley does not dispute Defendants' assertion in his Local Rule 56.1(b)(2) response. Doc. 242 at ¶ 23. He does attempt to raise doubts about the assertion in his reply brief, however, arguing that May lacks credibility and that Defendants should have provided more persuasive evidence about the role of seniority in the hiring process. Doc. 255 at 13-14. But by failing to object to Defendants' assertion in the manner required by Local Rule 56.1, Outley forfeited any dispute on that factual point. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218 (7th Cir. 2015) ("When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the [Local Rule 56.1], those facts are deemed admitted for purposes of the motion.") (quoting *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009)). So it is uncontested that, once Ealy was selected as one of the two most qualified candidates, the fact that Outley was more senior did not bear on the promotion decision.

### C.     Overtime Disparity

From October 22, 2016 through July 31, 2017, four ACOEs worked at the Lexington Pumping Station: Outley; Robert Soprych, who is white; Richard Langston, who is Black; and Chris Houlihan, who is white. Doc. 242 at ¶ 56; Doc. 222-8 at p. 2, ¶ 4. During that period, Outley worked 567.75 hours of overtime, Soprych worked 624 hours, Langston worked 643.25 hours, and Houlihan worked 669 hours. Doc. 242 at ¶ 56.

To explain Outley's relatively low number of overtime hours, Defendants assert that he made himself unavailable to work overtime on 13 days during that nine-month period. *Id*. at ¶ 57. Defendants support that assertion with a declaration from Mussen. Doc. 222-8 at p. 2, ¶ 5. Outley concedes in his Local Rule 56.1(b)(2) response that he "has no basis to dispute" the fact that he voluntarily made himself unavailable 13 times, but he nonetheless contests Defendants' assertion on the ground that it is "based solely on the declaration of Robert Mussen." Doc. 242

at ¶ 57; *see also* Doc. 241 at 9 (arguing that "only Mussen's statement … rather than any record evidence" supports the assertion). That argument is meritless, as a declaration based on personal knowledge is record evidence. *See Jajeh v. Cnty. of Cook*, 678 F.3d 560, 568 (7th Cir. 2012) ("Rule 56(c)(4) … allows a declaration to be used to [support] a motion for summary judgment, so long as it is 'made on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the affiant or declarant is competent to testify on the matters stated.'") (quoting Fed. R. Civ. P. 56(c)(4)). Mussen's declaration shows that he would be competent to testify about Outley's making himself unavailable for overtime shifts, as it avers that Mussen's duties included "coordinating, planning and assigning work schedules at Lexington." Doc. 222-8 at p. 1, ¶ 3. It is thus undisputed that Outley made himself unavailable for overtime 13 times during the nine-month period in question.

That said, Outley testified that he was "cheated out of overtime on a consistent basis" and that he filed a grievance protesting "the denial for my overtime," which was denied. Doc. 222-12 at 128:23-129:8. Outley further testified that Houlihan, Langston, and "the other guy at Lexington"—presumably Soprych—"form[ed] this alliance" to "knock down overtime for [Outley]" by "creat[ing] the overtime" only on his off days. *Id*. at 130:8-131:3. Outley also testified that Mussen was "the one that was denying [his] overtime." *Id*. at 130:1-3. Viewed in the light most favorable to Outley, the record includes evidence that the other Lexington ACOEs and Mussen took steps to reduce Outley's access to overtime opportunities.

### D.    Parking Lot Incident

On May 30, 2017, Outley and Mussen had a confrontation in the Lexington Pumping Station parking lot. Doc. 239 at ¶ 42; Doc. 242 at ¶ 35. It is disputed how the confrontation began. Mussen testified that he asked Outley and another employee—Ed Walsh—to help a third employee—Patrick Rawls—move some "roll filters," but that Outley "never acknowledged me"

and instead "abandoned his post and left the station." Doc. 222-14 at 55-56 (52:19-53:17). Outley testified that he did not exchange any words with Mussen, did not hear Mussen calling his name, and merely went to his car to get his cell phone charger. Doc. 222-12 at 32:6-21. Outley also testified that, three or four days before the incident, Mussen "had told me that his job was to get rid of me." *Id*. at 50:2-13. At this stage of the lawsuit, the court must credit Outley's testimony that he had innocent motives for leaving the building and that Mussen was trying to get him fired.

After Outley left the station, Mussen asked Walsh, Rawls, and an employee named Eduardo Beltran to follow Mussen out to Outley's car as witnesses. Doc. 239 at ¶ 43; Doc. 222-12 at 34:10-13. Mussen approached Outley's car and, according to Outley's 2017 deposition testimony in *Outley I*, "snatched" the passenger door open. Doc. 222-11 at 3 (67:22), 5 (18-20). In Outley's deposition in the present case, Outley added that Mussen also got into the car and sat in the passenger seat. Doc. 222-12 at 32:12-20. According to Outley, he asked Mussen, "[w]hat are you doing?", but Mussen said nothing. *Id*. at 33:6-8. Both men then exited the car and exchanged no further words. *Id*. at 35:6-11. Mussen, by contrast, testified that he merely opened the car door, asked Outley to return to the station to help with the filters, and then walked away, which is also the account that Walsh, Rawls, and Beltran gave. Doc. 222-14 at 57-58 (53:24-54:11); *id*. at 43-45. At this stage, the court must accept Outley's account that Mussen entered his vehicle and sat silently. Outley perceived Mussen's demeanor as threatening, testifying that Mussen "had a look of violence in his eyes we men know it to be," Doc. 222-11 at 5 (88:20-21), and that he believed that Mussen was attempting "to incite a violent reaction" from him, Doc. 222-12 at 34:19-20.

Later that day, Outley filed a violence in the workplace ("VIW") complaint against Mussen, which alleged that Mussen had given him "a threaten[ing] and coercive look." Doc. 239 at ¶ 44; Doc. 222-14 at 41-42. The City investigated, taking witness statements from Rawls, Walsh, and Beltran. Doc. 222-14 at 43-45, 52. Outley asked the City to retrieve security camera footage of the incident, but no footage was recovered because the cameras at Lexington did not work. Doc. 239 at ¶ 46; Doc. 242 at ¶ 74a; Doc. 217-8 at 57:19-59:1. Mussen remained at Lexington while the City investigated. Doc. 242 at ¶ 74b. On July 6, 2017, the City notified Outley that it was closing the complaint because it "[did] not involve allegations which, if true, would constitute a violation of the VIW Policy." Doc. 242 at ¶ 39; Doc. 222-14 at 40. Mussen was not disciplined. Doc. 239 at ¶ 49.

Separately, Mussen initiated disciplinary proceedings against Outley based on the incident. Doc. 239 at ¶ 45. The record does not disclose what, if anything, came of those proceedings. Mussen did not recall at his deposition the nature of the discipline or how the proceedings were resolved. Doc. 217-8 at 56:9-20. DWM's disciplinary history for Outley reflects that he was charged with "[i]nsubordination" and "[f]ailure to perform work as directed." Doc. 222-3 at p. 21.

Outley testified that the parking lot incident and the City's dismissal of his VIW complaint motivated his decision to leave the City's employ. He testified that "[his] life was threatened" by Mussen, Doc. 222-7 at 5:17, that he was a "target" like "other blacks in the city of Chicago," and that he "wasn't going to let [the City] kill me," *id*. at 6:24-7:3.

### E. Racist Comments

At his October 6, 2020 deposition in the present case, Outley was asked whether Mussen "ever ma[d]e any racist comments," and Outley replied "[a]ll of the time." Doc. 222-12 at

41:9-11.  Outley added that the last time he saw Mussen, Mussen said, "[y]ou look like a monkey scratching your head."  *Id*. at 41:14-22.

Asked for "other examples of what [Mussen] said," Outley replied, "he has used vulgarity.  He has used the 'N word.'  He has done a lot of negative things."  *Id*. at 42:17-22.  Outley testified that Mussen was a "constant user" of the N-word."  *Id*. at 49:14-18.  Defendants' counsel then asked, "When did Mr. Mussen use the 'N word'?"  *Id*. at 49:19.  Outley replied: "The last day I saw him."  *Id*. at 50:16.  When counsel asked whether this was the only time Mussen used that word, Outley responded, "No."  *Id*. at 50:18-19.  Construing Outley's testimony in the light most favorable to him, a reasonable inference is that Mussen called Outley a "monkey" and used the N-word the last day they saw each other—which, because Outley left the City's employ on July 31, 2017, must have been in late July 2017—and that Mussen used the N-word in Outley's presence on one or more other occasions.

Defendants observe that Outley has testified somewhat inconsistently about Mussen's use of the N-word.  Doc. 222 at ¶¶ 43-44; Doc. 221 at 17; Doc. 253 at 12.  For instance, at his July 11, 2017 deposition in *Outley I*—which took place before his last encounter with Mussen in late July 2017—Outley testified that Mussen had "[n]ot yet" used the N-word in his presence and that Mussen "catches himself" before using that word.  Doc. 222-11 at 7 (100:11-16).  During the same deposition, Outley testified that Mussen mumbled the N-word under his breath, but that he could not recall the number of times Mussen had done so.  *Id*. at 8-9 (101:18-102:6).  At Outley's continued deposition in the present case, which took place on October 26, 2020, he was asked, "[w]hat specifically did Mussen say to you that was demeaning or racially charged?"  Doc. 222-7 at 29:16-17.  Outley responded: "You can make a statement without using certain deteriorating words.  You can talk in a tone that has a sinister racial plot in it that's not the N

11

word or verbally abusive … ." *Id*. at 29:22-30:20. Counsel later asked "[w]hen did Mussen call you" the N-word, and Outley responded:

> I can't give you the hour, I cannot give you the date, I can't give you the month. He has used it. I've known Bob Mussen for 30 years. Yes, he's used it. … What day, what month, what hour, no, I can't tell you that because it wasn't important to me.

*Id*. at 31:19-32:2. That testimony is in some tension with Outley's testimony at his October 6, 2020 deposition that Mussen used the N-word in his presence in late July 2017, when they last saw each other.

Defendants argue that Outley's inconsistent testimony allows the court to draw an adverse credibility determination against him, reasoning that "a party cannot by affidavit retract damaging admissions without a good explanation." Doc. 221 at 17. In support, Defendants cite two cases on the "sham affidavit" rule, which prohibits "filing a later affidavit that flatly contradicts that party's earlier sworn deposition." *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999); *see also United States v. Stewart*, 198 F.3d 984, 986 (7th Cir. 1999) (same). The sham affidavit rule's basis is that "parties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions." *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir. 1996).

Defendants seek to extend the sham affidavit rule to the situation where, as here, a witness gives inconsistent testimony at different depositions. Such an extension would be improper. The Seventh Circuit has emphasized that the rule "must be applied with great care … because summary judgment is not a tool for deciding questions of credibility." *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 571 (7th Cir. 2015). In *Bank of Illinois*, the Seventh Circuit explained why the rule's scope must be limited:

> A definite distinction must be made between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go

12

> to the weight of the evidence. … To allow every failure of memory or
> variation in a witness's testimony to be disregarded as a sham would require
> far too much from lay witnesses and would deprive the trier of fact of the
> traditional opportunity to determine which point in time and with which words
> the witness … was stating the truth.  Variations in a witness's testimony and
> any failure of memory throughout the course of discovery create an issue of
> credibility as to which part of the testimony should be given the greatest
> weight if credited at all.  Issues concerning the credibility of witnesses and
> weight of the evidence are questions of fact which require resolution by the
> trier of fact.

75 F.3d at 1169-70 (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 953-54 (11th Cir. 1986)).

A district court relying on *Bank of Illinois* held that the rule does not apply to inconsistent

testimony across or within depositions.  *See Lennon v. Christoph*, 1997 WL 57150, at *5 (N.D.

Ill. Feb. 7, 1997).  The court is aware of no contrary authority applying the rule to testimony at

different depositions.  The court thus will assume at this stage that Mussen called Outley a

monkey and the N-word at least in late July 2017.

Finally, when asked how Mussen verbally demeaned him, Outley testified that Mussen

called him "Mo" and greeted him with the phrase "Hey, my boy," which he found disrespectful.

Doc. 222-12 at 113:14-21.  Outley did not say when Mussen made those comments.

### F. Racist Culture at DWM

Outley asserts that other racist incidents occurred at DWM, though not directed at him

personally: racist emails sent by employees, Doc. 216 at ¶¶ 24-28; racist screen savers, cartoons,

jokes, posters, and graffiti, Doc. 242 at ¶ 65d-e; and a noose found in a truck, *id*. at ¶ 65e.

Outley's evidence about the racist emails consists of two reports issued in 2017 by the

Chicago Office of Inspector General ("OIG").  Doc. 216 at ¶¶ 24-28.  (Outley placed in the

record only press releases about the reports, not the reports themselves.  Doc. 217-1 at 6-8.  The

court located the reports online.  *See* Chi. Office of Inspector Gen., Quarterly Report of the

Office of Inspector General: Second Quarter 2017 (July 2017),

https://igchicago.org/wp-content/uploads/2017/07/OIG-2nd-Quarter-2017-Report-3.pdf; Chi. Office of Inspector Gen., Quarterly Report of the Office of Inspector General: Third Quarter 2017 (Oct. 2017), https://igchicago.org/wp-content/uploads/2017/10/OIG-Third-Quarter-2017-Report.pdf.)  The reports state that two unnamed DWM employees—neither alleged to have any connection to this suit—sent racist emails to co-workers and were forced to resign.

The reports' contents are inadmissible hearsay, as Outley seeks to use them to prove that the events happened as described.  *See* Fed. R. Evid. 801(c) (defining hearsay as an out-of-court statement offered to prove the truth of the matter asserted therein).  Outley asks the court to take judicial notice under Evidence Rule 201 of the reports' contents.  Doc. 216 at ¶ 24 n.3. Defendants object, arguing that the reports' factual findings are subject to reasonable dispute. Doc. 238 at 13; Doc. 239 at ¶ 24 n.6; *see Ennenga v. Starns*, 677 F.3d 766, 773-74 (7th Cir. 2012) ("A court may take judicial notice of facts that are (1) not subject to reasonable dispute and (2) either generally known within the territorial jurisdiction or capable of accurate and ready determination through sources whose accuracy cannot be questioned."); *see also Daniel v. Cook Cnty.*, 833 F.3d 728, 742 (7th Cir. 2016) (holding that hearsay statements in court filings are usually not subject to judicial notice, which is "a powerful tool that must be used with caution"). Outley's reply brief does not defend the admissibility of the OIG reports' contents with any legal argument, but merely urges the court to exercise its "discretion" to admit them.  Doc. 255 at 4. The court does not enjoy the discretion to admit inadmissible evidence, and Outley forfeited any other response to Defendants' reasoned argument for excluding the reports' contents.

The complaint alleges the presence of racist screen savers, cartoons, jokes, posters, and graffiti at DWM.  Doc. 55 at ¶¶ 63-64.  Outley testified that he had seen those things, but he could not recall when or where or give any specifics.  Doc. 222-7 at 99:13-15 (screen savers),

99:24-100:9 (cartoons), 100:15-19 (jokes), 101:19-102:2 (posters), 110:8-111:8 (graffiti). Outley's testimony therefore does not establish any foundation for his personal knowledge that such events occurred at DWM. *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); *Ani-Deng v. Jeffboat, LLC*, 777 F.3d 452, 454-55 (7th Cir. 2015) (ascribing "no weight" to an affiant's averment that an employer's actions were discriminatory and retaliatory, where there was no evidence that the averment was based on facts of which the affiant had personal knowledge); *Davis v. City of Chicago*, 841 F.2d 186, 189 (7th Cir. 1988) ("[The plaintiff's] conclusory assertion, unsubstantiated with any specific facts, fails to indicate any factual basis which would tend to show that he had personal knowledge of the matter."). There is no other record evidence that those events occurred. As for the noose, Outley testified that there was a noose found in a truck, presumably a DWM truck. Doc. 222-7 at 105:10-11. Outley read news coverage about the noose, but he did not personally see it. *Id*. at 106:10-17, 107:10-14. Construed in the light most favorable to Outley, his testimony shows that someone at DWM saw a noose, but there is no evidence that anyone with whom Outley worked was involved.

Outley also asserts that DWM had a "culture of racism." Doc. 216 at ¶¶ 35, 38. Conner was hired as Commissioner of DWM after several management personnel resigned because of the above-referenced OIG reports. Doc. 239 at ¶¶ 32-33; Doc. 217-6 at 27:22-28:10. Conner testified that "there were racial problems with [DWM]," Doc. 217-6 at 42:15-18, and that he had read a newspaper article in which then-Mayor Emanuel referred to a "culture" at DWM, but not specifically a culture of racism. *Id*. at 40:10-23. Alderman Roderick Sawyer testified that he once stated to the press that "[t]he pervasive culture of racism at [DWM] has been an open secret for years." Doc. 239 at ¶ 38; Doc. 217-7 at 32:17-33:3.

Finally, Outley asserts that Conner "initiated new policies and procedures regarding [equal employment opportunity ("EEO")] training" when he became Commissioner. Doc. 216 at ¶ 34; Doc. 243 at ¶¶ 81-82. In support, Outley cites Conner's testimony that, in "the latter half of 2017," he developed new policies for "EEO training" because "supposedly … there was racism within [DWM]." Doc. 217-6 at 21:7-22:1, 23:14-15. Defendants object to the admission of evidence regarding Conner's implementation of a new EEO policy under Evidence Rule 407, which prohibits offering evidence of subsequent remedial measures to prove culpable conduct. Fed. R. Evid. 407; *see* Doc. 254 at ¶¶ 5-6; Doc. 253 at 18.

Rule 407 provides: "When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove … culpable conduct … . But the court may admit this evidence for another purpose, such as impeachment or … control … ." As the Seventh Circuit explained, Rule 407 prohibits the admission of "a measure taken after the event in litigation, which measure, had it existed at the time, would have avoided the event in litigation." *Ford v. Schmidt*, 577 F.2d 408, 411 (7th Cir. 1978) (affirming the exclusion of a new prison policy that would have made it easier for the plaintiffs to send legal mail). Courts thus must exclude evidence of a new policy for the purpose of showing that the defendant's earlier practices were unlawful. *See Saathoff v. City of Champaign*, 2015 WL 13273314, at *3 n.3 (C.D. Ill. May 18, 2015) (excluding evidence of a police department's new policy regarding use of force). The fact that Conner implemented a new EEO policy is accordingly inadmissible to show that, before the new policy, the City engaged in unlawful acts of discrimination.

## G. Other Evidence of Adverse Treatment

Finally, Outley lists thirteen categories of conduct to support his hostile work environment and retaliation claims. Doc. 241 at 14-16, 22-23. The preceding sections address

the most substantial categories—"denied promotions," "denied overtime," the "parking lot incident," "harassed based on race," and "subjected to unwelcome racially-charged conduct." *Id.* at 15-16. This section addresses the remaining categories.

1.      Outley asserts that Mussen gave him undesirable days off 30 times between October 2016 and July 2017. Doc. 243 at ¶ 79. Outley testified to that fact. Doc. 222-12 at 96:21-23. Outley also testified that, by less desirable days off, he meant that Mussen refused some of his requests to extend two-day weekends into four- or five-day weekends, and added that Mussen would deny those requests because it was a "[h]ardship on the job" and that, as COE, Mussen generally "ha[d] the power to deny your request." *Id.* at 96:1-13. Defendants assert and Outley admits that Mussen denied time-off requests when they were untimely or would result in a staff shortage, and that Mussen could justifiably deny requests for those reasons. Doc. 242 at ¶ 63b-c; Doc. 222-8 at p. 2, ¶¶ 6-7. An internal email sent by Mussen corroborates that explanation. Doc. 222-14 at 61. The evidence, even when viewed in the light most favorable to Outley, is that his time-off requests were often denied, but for reasons unrelated to race.

2.      Outley asserts that Mussen ordered him to change filters even though that task was for individuals with a lower job title, and Defendants dispute that assertion. Doc. 239 at ¶ 50. Outley did testify that Mussen told him to change filters, Doc. 222-12 at 122:14-16, and that the task was "menial" and beneath his grade, *id.* at 124:14-19. It is undisputed, however, that Outley never in fact changed filters, because he recruited a lower-ranking co-worker for the task. Doc. 242 at ¶ 63d; Doc. 256 at ¶ 4; Doc. 222-7 at 75:21-24.

3.      Outley acknowledges that he received the most "acting-up" hours—a term referring to the opportunity to temporarily work at a higher grade—of any ACOE since October

2016. Doc. 242 ¶ 73; Doc. 241 at 9 ("Outley does not dispute the City's numbers that he received the most acting up hours during the relevant time period … ."). Outley argues, however, that he was deprived of acting-up hours prior to October 2016. Doc. 241 at 9. But there is no record evidence of any earlier denials. Accordingly, there is no evidence that Outley was denied opportunities to work up in grade during the pre-October 2016 time frame.

4.    Defendants assert that Outley cannot identify any training opportunities that he was denied. Doc. 222 at ¶ 63. Outley retorts that he was denied the opportunity to participate in an electric generation training at the Lexington Pumping Station during a period when he was temporarily assigned to the Jardine Water Purification Plant. Doc. 242 at ¶ 63f; Doc. 241 at 23. But Outley's stint at Jardine took place in 2013, Doc. 242 at ¶ 34, and, as discussed, the *Outley I* judgment precludes any claim arising from events that occurred in 2013.

5.    Outley asserts that he was not fairly compensated for doing administrative work that was ordinarily performed by COEs. Doc. 242 at ¶ 64a. He testified that he "was told to fill out paperwork in the form of logs and stuff like that" and "given chief duties," but that he "didn't get paid for chief." Doc. 222-7 at 66:13-23. Outley concedes, however, that every ACOE was required to fill out the logbook, and none was paid extra for that task. Doc. 242 at ¶ 64b. Beyond the logbook issue, his deposition testimony—which is the only evidence he cites—does not further illuminate the nature of the extra work, the personnel rules governing it, or the allegedly unfair treatment he received. Doc. 222-7 at 66:21-68:7.

6.    Outley asserts that an allegedly false VIW complaint that Houlihan filed against him in 2013 was an instance of harassment that can bolster his hostile work environment claim. Doc. 242 at ¶¶ 32, 76; Doc. 241 at 15, 18-19. As noted, any claim based on events that occurred in 2013 is precluded.

7.     Outley asserts that he has been subject to harsh and undue discipline.  Doc. 241 at 16, 17, 22.  The parties dispute the fairness of disciplinary actions taken against Outley between April 2011 and February 2013.  Doc. 242 at ¶¶ 45-49.  Any claims arising from those events are precluded, so there is no need to discuss them.

More recently, on February 8, 2017, Mussen issued Outley a written reprimand for violating the City's overtime policy.  Doc. 222-3 at ¶ 10; *id*. at pp. 19-20.  Outley's only response to Defendants' Local Rule 56.1(a)(2) assertion regarding this discipline is that the event is "irrelevant."  Doc. 242 at ¶ 50.  Outley thus identifies no evidence suggesting that the February 2017 disciplinary charge was unfounded.  When Outley left the City's employ, there were two outstanding disciplinary charges against him, from April 2017 and June 2017.  Doc. 222-3 at ¶ 11; *id*. at p. 21.  Outley asserts that the existence of those charges supports his allegation of excessive discipline, but he points to no evidence suggesting that the charges were unfounded or invidiously motivated.  Doc. 242 at ¶ 51.

### Discussion

## I.     ADEA Claim

Outley's ADEA claim is premised on the City's decision to promote Ealy rather than him to COE in 2017.  Doc. 217 at 17; Doc. 241 at 11.  The ADEA "makes it unlawful for an employer … 'to fail or refuse to hire … or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.'"  *Carson v. Lake Cnty.*, 865 F.3d 526, 532 (7th Cir. 2017) (quoting 29 U.S.C. § 623(a)(1)).  Defendants contend that there is insufficient evidence for a reasonable jury to find for Outley on his ADEA claim.  Doc. 221 at 13.

Under the framework set forth in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), Outley's claim survives summary judgment only if he adduces evidence that,

"considered as a whole," would allow a reasonable jury to find that his age caused his denied promotion. *Id*. at 765; *see also Skiba v. Ill. Cent. R.R.*, 884 F.3d 708, 719 (7th Cir. 2018) ("Because plaintiff seeks to recover under a theory of disparate treatment, he must prove, by a preponderance of the evidence, that age was the but-for cause of the challenged adverse employment action.") (internal quotation marks omitted). To satisfy his evidentiary burden, Outley may rely on the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Ortiz*, 834 F.3d 766. The *McDonnell Douglas* framework requires Outley to adduce evidence showing that he belonged to a protected age class, met his employer's legitimate expectations, suffered an adverse employment action, and was similarly situated to other employees who were not members of the protected class and who were treated better—together, his *prima facie* case—provided that the City fails to articulate a reasonable alternative explanation for his denied promotion or he shows that the proffered alternative explanation is a pretext for discriminatory animus. *See David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017). That framework is just one way the record can allow a reasonable jury to find age discrimination. *See Volling v. Kurtz Paramed. Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) (noting that *McDonnell Douglas* provides "a common, but not exclusive, method of establishing a triable issue of intentional discrimination") (internal quotation marks omitted). The court may not limit its analysis to *McDonnell Douglas* or treat some evidence as relevant to the *McDonnell Douglas* analysis but not to the broader question of whether, "consider[ing] all admissible evidence" as a whole, "a reasonable jury could find that [Outley] suffered an adverse action because of [his] age." *Skiba*, 884 F.3d at 720 (internal quotation marks omitted); *see also Terry v. Gary Cmty. Sch. Corp.*, 910 F.3d 1000, 1004-05 (7th Cir. 2018) ("Although the oft-cited burden shifting framework from *McDonnell Douglas* …

provides a means of organizing, presenting, and assessing circumstantial evidence, we must consider the evidence as a whole in deciding whether to grant summary judgment.") (citations and internal quotation marks omitted).

Accordingly, the court will "begin [its] assessment of the evidence by employing th[e *McDonnell Douglas*] construct and addressing first whether [Outley] has established" a genuine dispute under that framework. *David*, 846 F.3d at 224. If Outley fails to do so, the court will then "assess cumulatively all the evidence … to determine whether it permits a reasonable factfinder to determine that" the City failed to promote him due to his age. *Ibid*.; *see also Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 631 (7th Cir. 2018) (similar).

Outley fails to establish his *prima facie* case under *McDonnell Douglas* because he identifies no similarly situated employee unprotected by the ADEA who received a promotion to COE. The ADEA protects "individuals who are at least 40 years of age." 29 U.S.C. § 631(a). As a result, a successful *McDonnell Douglas* theory under the ADEA requires a comparator who is less than 40 years old. *See Dewitt v. Proctor Hosp.*, 517 F.3d 944, 947 (7th Cir. 2008) ("[The plaintiff's] inability to satisfy the requirement, under the often-cited *McDonnell Douglas* test, that she was replaced by someone outside the protected group—someone under 40 years of age—dooms her age discrimination claim."). Here, Outley's claim was premised on his assertion that Ealy was "under 40 years old" when she received the promotion. Doc. 217 at 17. But, as Outley now admits, Ealy in fact was around 50 years old when she was promoted. Doc. 255 at 13. So Ealy is not a relevant comparator under the ADEA, and Outley does not identify any other potential comparator.

Outley's claim also fails under the *Ortiz* holistic approach. The record contains no evidence suggesting that Outley's age played any role in the City's decision not to promote him.

No City employee ever made a negative comment about his age. Doc. 222-7 at 18:19-21. Outley argues that he should have received the promotion because he had more seniority than Ealy. Doc. 255 at 13-14. Yet, as explained above, the City has adduced evidence that success on the test and during the interview, not seniority, determined who would be promoted, and Outley does not create any genuine dispute as to that fact. Doc. 242 at ¶ 23; Doc. 222-8 at p. 5, ¶ 8. Furthermore, if Outley means that he was discriminated against *because of* his seniority, that fact would not give rise to liability under the ADEA. *See Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993) ("Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily 'age based.'").

Because no reasonable jury could conclude that Outley was passed over for promotion because of his age, the City is granted summary judgment on his ADEA claim. It necessarily follows that Outley is denied summary judgment on that claim.

## II.     Title VII Claims

Title VII's antidiscrimination provision makes it "unlawful … for an employer … to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In opposing summary judgment, Outley seeks to defend five race discrimination claims: (1) disparate treatment based on the denied promotion to COE; (2) disparate treatment based on the overtime disparity; (3) a racially hostile work environment; (4) constructive discharge; and (5) retaliation. Doc. 241 at 8-10, 13-24.

### A.     2017 Failure to Promote

Regarding his claim that he was denied the promotion to COE due to his race, Outley appears to satisfy his *prima facie* case under the *McDonnell Douglas* framework. He is Black, a

22

protected characteristic. The City does not dispute that he met its legitimate expectations for promotion, Doc. 221 at 11, and he did pass the written exam, Doc. 226-1 at 16-18. A failure to promote is an adverse employment action. *See Hill v. Potter*, 625 F.3d 998, 1003 (7th Cir. 2010) ("Failure to promote can be an adverse action giving rise to liability … ."). And Murphy was a similarly situated white employee who received the promotion. Doc. 242 at ¶ 26a.

As a reasonable alternative explanation for its decision to promote Murphy rather than Outley, the City contends that Outley performed poorly at the interview stage of the application process, giving incomplete and inaccurate answers. Doc. 221 at 11. As discussed, there is no genuine fact dispute on that point, as the City has adduced specific, uncontroverted evidence of Outley's sub-par responses about condensers, steam valves, and other matters. Doc. 228-1 at 54.

Outley counters that the City's reason for not promoting him was pretextual because he scored highest on the written exam and was the only candidate interviewed by Materre. Doc. 241 at 8. To raise a material fact dispute as to pretext, Outley "must identify such weaknesses, implausibilities, inconsistencies, or contradictions in [the City's] asserted reasons that a reasonable person could find them unworthy of credence." *Skiba*, 884 F.3d at 724. "Pretext is more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Silverman v. Bd. of Educ. of Chi.*, 637 F.3d 729, 743-44 (7th Cir. 2011) (alterations and internal quotation marks omitted), *overruled on other grounds by Ortiz*, 834 F.3d at 764-65.

Outley's pretext argument comes up short. The record indisputably shows that a passing grade on the written portion of the application process was merely a prerequisite to an interview, with final promotion decisions based on the interview as well as the written exam. Doc. 242 at ¶¶ 21, 23. And Outley's theory that the City had Materre, who is Black, interview him because it

knew that Materre gave negative reviews to other Black candidates is pure speculation. There is no evidence in the record imputing that motive to the City. On the contrary, the evidence shows that the City had Materre interview Outley because Henmueller, who interviewed the other candidates, expressed concern about interviewing Outley given his involvement in *Outley I*. Doc. 243-1 at 3. No reasonable jury could find pretext on this record.

Because Outley cannot forestall summary judgment under *McDonnell Douglas*, the court next "assess[es] cumulatively all the evidence" on which he relies "to determine whether it permits a reasonable factfinder to determine" that he was denied promotion because of his race. *David*, 846 F.3d at 224. Outley's claim fares no better under this approach. There is no evidence that the City considered Outley's race in deciding not to promote him. Taking the opposite view, Outley points to his testimony that Materre and Holland ended his interview abruptly without "formality" and "etiquette." Doc. 222-12 at 10:12-11:16. But the fact that Outley's interviewers were informal and impolite would not permit a reasonable jury to infer that racial bias infected their evaluation of him. *Cf. Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 548 (7th Cir. 2011) ("If the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed.") (internal quotation marks omitted).

## B. Overtime Disparity

Outley contends that he was given the fewest overtime hours of the four ACOEs at the Lexington Pumping Station because he is Black. Doc. 241 at 9-10. Again, Outley can make out a *prima facie* case under *McDonnell Douglas*. During the period in question, he received the fewest overtime hours (567.75), while Houlihan, a white ACOE, received the most (669). Doc. 242 at ¶ 56. Outley testified that this disparity resulted from a concerted effort by his co-workers and supervisor to deprive him of overtime. Doc. 222-12 at 130:1-131:3. Those facts

establish, at least at summary judgment, that Outley suffered an adverse employment action and that a comparator outside his protected class did not. *See Formella v. Brennan*, 817 F.3d 503, 511 (7th Cir. 2016) ("When overtime pay or premium pay is a significant and expected part of an employee's annual earnings, denial of such pay may constitute an adverse employment action.").

The City, however, has adduced undisputed evidence of a reasonable alternative explanation for the disparity: Outley made himself unavailable to work overtime on 13 days during the relevant period. Doc. 242 at ¶ 57. Outley mounts no argument that the City's proffered explanation is pretextual. Doc. 241 at 10. A party opposing summary judgment must adduce specific evidence that creates a genuine dispute of material fact. *See Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015) ("If the moving party has properly supported [its] motion, the burden shifts to the non-moving party to come forward with specific facts showing that there is a genuine issue for trial."). Outley fails to do so here, so no reasonable jury could conclude that the City's reasonable explanation is a lie.

Finally, considering the record as a whole, there is no material fact dispute as to the distribution of overtime among the Lexington ACOEs, and no reasonable inference to be drawn that the distribution was racially biased. It bears mention that Langston, another Black ACOE, worked the second-most overtime hours—643.25, about 25 fewer than Houlihan and 20 more than Soprych. Doc. 242 at ¶ 56. No reasonable jury could conclude from the record, taken as a whole, that Outley was targeted for unfavorable treatment regarding overtime due to his race.

## C. Hostile Work Environment

Title VII's discrimination provision "encompasses the creation of a hostile work environment that is severe or pervasive enough to affect the terms and conditions of employment." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 561 (7th Cir. 2016) (internal quotation marks omitted). For Outley's hostile work environment claim to survive summary

judgment, he must adduce evidence sufficient for a reasonable jury to find that: "(1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on membership in a protected class or in retaliation for protected behavior; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Abrego v. Wilkie*, 907 F.3d 1004, 1014 (7th Cir. 2018) (internal quotation marks omitted).

The City argues that any harassment Outley suffered does not qualify as severe or pervasive. Doc. 221 at 18-19; Doc. 253 at 12-13. The "severe or pervasive" element of a hostile work environment claim is phrased "in the disjunctive—the conduct must be either severe or pervasive." *Vance v. Ball State Univ.*, 646 F.3d 461, 469 (7th Cir. 2011), *aff'd*, 570 U.S. 421 (2013). This means that "one extremely serious act of harassment could rise to an actionable level[,] as could a series of less severe acts." *Hall v. City of Chicago*, 713 F.3d 325, 330 (7th Cir. 2013) (internal quotation marks omitted). A court addressing whether harassment is "severe or pervasive" must consider "factors like the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance." *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016); *see also Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018) (similar). In so doing, the court must bear in mind that Title VII does not impose a "general civility code" and that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation and internal quotation marks omitted). That said, "the [work] environment need not reach the point of 'hellishness'" to be actionable. *Johnson*, 892 F.3d at 901; *accord Gates*, 916 F.3d at 637 ("While a 'hellish' workplace is surely actionable, plaintiffs' evidence need not

show a descent into the Inferno."). "Whether harassment was so severe or pervasive as to constitute a hostile work environment is generally a question of fact for the jury." *Johnson*, 892 F.3d at 901.

Drawing all reasonable inferences in Outley's favor, the summary judgment record shows that Mussen committed at least two serious instances of harassment in late July 2017: telling Outley that he "look[ed] like a monkey scratching [his] head," and "us[ing] the 'N word' … pointed to [Outley]." Doc. 222-12 at 41:14-19, 49:15-18. A supervisor's using the N-word toward a Black employee qualifies as severe racial harassment. *See Gates*, 916 F.3d at 640 (reversing the district court's grant of summary judgment to the employer where the plaintiff's "supervisor used race-based epithets including the N-word directly and in reference to him"); *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018) (same, where "the district court concluded that a few instances of the use of [the N-word] were not significant enough to meet the standard for hostile environment").

Although the severity of the word "monkey" is more fact dependent, *see Ellis*, 650 F.3d at 648 (holding that use of the word "monkey" when referring to a particular book title did not evince racial hostility), the word functions as a racial slur when directed as an insult toward a Black person. *See Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 869 (7th Cir. 2013) (holding that a reasonable trier of fact could deem the term "gorilla" a racial slur); *Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 911 (8th Cir. 2006) ("The use of the term 'monkey' and other similar words have been part of actionable racial harassment claims across the country."); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001) ("[The supervisor's] constant use of the word 'monkey' to describe African Americans was … odious. To suggest that a human being's physical appearance is essentially a caricature of a jungle beast

27

goes far beyond the merely unflattering; it is degrading and humiliating in the extreme."). Mussen told Outley that he looked like a monkey "scratching [his] head," Doc. 222-12 at 41:14-21, and a reasonable jury could find that Mussen used the word as a racial epithet, making it a severe instance of harassment. *See Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002) ("[W]e have recognized before that an unambiguously racial epithet falls on the 'more severe' end of the spectrum.").

The other actions by Mussen lend further strength to Outley's hostile work environment claim, or at least a reasonable jury could so find. The parking lot incident, standing alone, might not qualify as harassing, *see Vance*, 646 F.3d at 470 ("Making an ugly face at someone and staring, while not the most mature things to do, fall short of the kind of conduct that might support a hostile work environment claim."); *Cain v. Locke*, 483 F. App'x 276, 281 (7th Cir. 2012) (finding no "objectively hostile environment" where a co-worker "would walk by and glare at [the plaintiff]"), but could be viewed as pertinent in light of Mussen's other conduct. Likewise, Mussen's greeting Outley with "Hey, my boy," Doc. 222-12 at 113:14-22, could also reasonably be viewed as having a racial tinge. *See Nichols v. Mich. City Plant Plan. Dep't*, 755 F.3d 594, 602 (7th Cir. 2014) (holding that "evidence of a manager referring to African-American employees as 'boy'" can be "probative of discriminatory animus" if "the comment was uttered in a discriminatory manner"). The same holds for Mussen's ordering Outley to change filters, normally a job reserved for lower-ranked employees. Doc. 241 at 15.

The question is whether, based on the entire record, "a reasonable jury could find that [Mussen's] conduct was severe or pervasive." *Robinson*, 894 F.3d at 828. Put differently, would the court be obligated to overturn a jury verdict in Outley's favor on this record? *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986) ("[T]he 'genuine issue' summary

28

judgment standard is very close to the 'reasonable jury' directed verdict standard … .") (internal quotation marks omitted). The answer is no. Outley testified that Mussen—his direct supervisor, not a co-worker—directed at least two racial slurs toward him. *See Gates*, 916 F.3d at 638 ("We have repeatedly treated a supervisor's use of racially toxic language in the workplace as much more serious than a co-worker's."). Those two slurs alone could sustain a finding that the harassment directed at Outley was severe. *See Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) (affirming a plaintiff's verdict where the plaintiff's supervisor "used [the N-word] twice in [his] presence, though [he] could not recall the precise context in which it was used").

There is sufficient evidence as well to establish the other elements of Outley's hostile work environment claim. The City does not contend that Mussen's harassment was not motivated by race. *See Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004) (describing "racial slurs" as "overtly race-related behavior"). And the City may be held strictly liable for a supervisor's harassing conduct. *See Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 607 (7th Cir. 2021) ("An employer is liable in a hostile work environment case if …a supervisor participated in the harassment (giving rise to strict liability) … .").

The City therefore is not entitled to summary judgment on Outley's hostile work environment claim. Outley's request for summary judgment on that claim is denied as well. For reasons unexplained, Outley's motion does not rest on Mussen's alleged slurs, but instead focuses on the denial of his promotion to COE. Doc. 217 at 10-14. Because the City's denial of that promotion was not discriminatory, Outley's request for summary judgment on the hostile work environment claim is denied.

29

### D.    Constructive Discharge

Outley also claims that he was constructively discharged.  Doc. 217 at 18-19; Doc. 241 at 19-21.  "'Constructive discharge' is akin to a hostile work environment claim and may occur 'when an employer makes employment so unbearable that an employee resigns.'"  *Ulrey v. Reichhart*, 941 F.3d 255, 261 (7th Cir. 2019) (quoting *Palka v. Shelton*, 623 F.3d 447, 453 (7th Cir. 2010)).  Of particular significance here, "[a] constructive discharge can result from a hostile work environment only if the environment is 'even more egregious than that needed for a hostile work environment.'"  *Id.* at 262 (quoting *Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d 394, 401 (7th Cir. 2010)).  The prototypical case of a constructive discharge involves "a threat to a plaintiff's personal safety."  *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010); *see also Patton v. Keystone RV Co.*, 455 F.3d 812, 818 (7th Cir. 2006) ("When it becomes reasonable to fear serious physical harm, it becomes reasonable to quit immediately rather than seek redress while on the job.").

To support his constructive discharge claim, Outley (again) does not rely on Mussen's racial slurs—which forfeits any reliance on the slurs as a basis for this claim.  *See Nichols*, 755 F.3d at 600 ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment."); *Domka v. Portage Cnty.*, 523 F.3d 776, 783 (7th Cir. 2008) ("It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered.") (internal quotation marks omitted).  Outley instead points to his "sense that his health was at risk and his very life was in danger."  Doc. 217 at 19; *see also* Doc. 241 at 21 ("The fear for his safety and life made continued employment with the City intolerable.").  Outley cites three incidents that made him fear for his safety: (1) the parking lot incident with Mussen and subsequent denial of his VIW complaint; (2) being ordered to change filters by climbing

30

scaffolding; and (3) an unknown DWM employee's seeing a noose at an unknown time and location. Doc. 241 at 19-20. Outley's summary judgment motion on this claim adds that the general climate of racism at DWM reinforced the threat to his safety. Doc. 217 at 19. Outley also cites several events that occurred in 2011 and 2013, *id*. at 18, but the court does not consider them on preclusion grounds.

Outley's evidence regarding the noose and other racial incidents at DWM, while disturbing, reveals no link to his own workplace experience. Outley could not say who found the noose or where or when, and pointed only to coverage "in the paper." Doc. 222-7 at 106:17. (No media coverage is in the record.) Significantly, when asked "[h]ow did the noose affect you?", Outley responded that he did not "bring [his] feelings to work," *id*. at 108:7-13, effectively denying any impact on his work environment. The evidence about a culture of racism at DWM consists of testimony from Conner and Sawyer that "there were racial problems within the [DWM]," and that "[t]he pervasive culture of racism at the Water Department has been an open secret for years." Doc. 217-6 at 42:15-18; Doc. 217-7 at 32:17-33:3. But that testimony, which ventured into no detail, would not permit a reasonable jury to find that Outley reasonably felt a threat to his own personal safety from DWM's culture. *See Yancick*, 653 F.3d at 545 ("[T]he more remote or indirect the act claimed to create a hostile working environment, the more attenuated the inference that it had an effect on the terms and conditions of the plaintiff's workplace."); *Yuknis v. First Student, Inc.*, 481 F.3d 552, 556 (7th Cir. 2007) ("The American workplace would be a seething cauldron if workers could with impunity pepper their employer and eventually the EEOC and the courts with complaints of being offended by remarks and behaviors unrelated to the complainant except for his having overheard, or heard of, them.").

31

As for the filters, the court credits Outley's testimony that changing filters would have involved scaling 15 feet of scaffolding, which he feared given his age and diabetic condition. Doc. 222-12 at 121:12-22. But Outley never had to change filters because others did it for him. Doc. 242 at ¶ 63d; Doc. 256 at ¶ 4. No reasonable jury could find that Outley suffered harassment even more egregious than a hostile work environment by being asked to perform a task and having a co-worker perform it for him.

As for the parking lot incident, Outley emphasizes his testimony that Mussen "had a look of violence in his eyes we men know it to be." Doc. 222-11 at 5 (88:20-21). Outley also testified that the denial of his VIW complaint made him think that the City was "coming to kill me." Doc. 222-7 at 9:9. Even if Outley felt subjectively threatened, a constructive discharge claim requires conduct that, "from an *objective* standpoint, 'became so intolerable that [the employee's] resignation qualified as a fitting response.'" *Swearnigen-El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 859 (7th Cir. 2010) (emphasis added) (quoting *Penn. State Police v. Suders*, 542 U.S. 129, 134 (2004)). No reasonable jury could find that the parking lot incident and its aftermath objectively required Outley to resign for his safety. Mussen sat in Outley's car silently, Doc. 222-12 at 32:12-33:8, and the City denied Outley's complaint because Mussen's conduct did not amount to a violation of its policies. Doc. 242 at ¶ 39; Doc. 222-14 at 40. At worst, this sequence of events discloses erratic and impolite behavior, not harassment of sufficient objective severity to support a constructive discharge claim. *See Vance*, 646 F.3d at 470; *Cain*, 483 F. App'x at 281.

Before concluding, it bears repeating that Outley's hostile work environment claim survives summary judgment due to Mussen's racial slurs. But Outley does not rely on those slurs to defend his constructive discharge claim, and the conduct upon which he relies was not

32

severe enough to satisfy the more stringent standard governing constructive discharge claims. No reasonable jury could find that Outley was constructively discharged, so the City is granted summary judgment on the constructive discharge claim. It necessarily follows that Outley is denied summary judgment on that claim.

### E.     Retaliation

Title VII's antiretaliation provision "prohibits retaliation against employees who engage in statutorily protected activity by opposing an unlawful employment practice or participating in the investigation of one." *Lord*, 839 F.3d at 563 (citing 42 U.S.C. § 2000e-3(a)). "To establish a … retaliation [claim] under Title VII, [Outley] must show: (1) he engaged in a statutorily protected activity, (2) his employer took a materially adverse action against him, and (3) there is a causal link between the protected activity and the adverse action." *Mollet v. City of Greenfield*, 926 F.3d 894, 896 (7th Cir. 2019).

It is undisputed that Outley engaged in the statutorily protected activities of filing two EEOC charges in 2012 and 2013 and *Outley I* in 2013. Doc. 239 at ¶¶ 19-20; Doc. 221 at 14; Doc. 241 at 23; *see Lewis v. Wilkie*, 909 F.3d 858, 867 (7th Cir. 2018) ("[F]ormal EEOC charges are the most obvious form of statutorily protected activity.") (internal quotation marks omitted). As for materially adverse actions, Outley predicates his retaliation claim on every event that he believes supports his other claims, as set forth above. Doc. 241 at 22-23. Even if every wrong of which Outley complains were materially adverse, there is no evidence of any causal link between his protected activities and the adverse actions.

"To prove causation, [Outley] must show that the desire to retaliate was the but-for cause of" a materially adverse action, meaning that the action "would not have occurred in the absence of" his protected activity. *Robinson*, 894 F.3d at 830 (internal quotation marks omitted); *see also Mollet*, 926 F.3d at 897 (holding that the plaintiff must show that "the protected activity was *the*

but-for cause of the adverse action," not merely "*a* but-for cause"). A Title VII retaliation claim survives summary judgment if the plaintiff presents evidence that, "considered as a whole," would allow a reasonable jury to find but-for causation. *Ortiz*, 834 F.3d at 765. As in the disparate treatment context, a plaintiff may rely on the *McDonnell Douglas* burden-shifting framework to show causation. *See Donley v. Stryker Sales Corp.*, 906 F.3d 635, 639 (7th Cir. 2018) ("Evidence that similarly situated employees outside the legally protected group were treated differently may furnish circumstantial evidence of retaliation or other unlawful motive.").

Outley invokes *McDonnell Douglas* here, Doc. 241 at 21-22, so the court considers it first. But Outley fails to adduce evidence to support an element of his *prima facie* case under *McDonnell Douglas*: a similarly situated employee who did not engage in activity protected by Title VII. Outley argues in general terms that "he was treated less favorably than similarly-situated employees who did not engage in protected activity." Doc. 241 at 24. But he does not name any specific comparator; in fact, there is no evidence in the record of Title VII-protected activity or inactivity of any of Outley's co-workers. Outley himself admits as much—in a footnote—seemingly implying that the lack of evidence means that his claim could still succeed. *Id*. at 24 n.5. But *McDonnell Douglas* "requires the plaintiff to carry the burden of production on [his] four-part prima facie case." *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 500 (7th Cir. 2017). Outley has not carried that burden as to the comparator element, so his retaliation claim cannot survive summary judgment under *McDonnell Douglas*.

The court must also "assess cumulatively all the evidence" on which Outley relies "to determine whether it permits a reasonable factfinder to determine" that his EEOC charges and *Outley I* caused the allegedly adverse actions he suffered. *David*, 846 F.3d at 224. There is no evidence supporting that inference. No one ever stated, suggested, or even hinted that Outley

34

was being punished for filing the EEOC charges or bringing *Outley I*. As explained above, the City has adduced neutral and unrebutted explanations for all the personnel actions it took toward Outley, including the denied promotion, Doc. 229-1 at ¶ 7, relatively low amount of overtime, Doc. 242 at ¶ 57, undesirable days off, *id.* at ¶ 63b-c, and disciplinary charges, *id.* at ¶¶ 50-51. There is evidence that Mussen racially harassed Outley and made him feel threatened in the parking lot. But Outley adduces no evidence that Mussen was aware of his EEOC charges and lawsuit, let alone that he targeted Outley for filing them. Outley's counsel did not even ask Mussen about Outley's prior EEOC charges or lawsuit at Mussen's deposition. Doc. 217-8. No reasonable jury could find that Mussen was retaliating against Outley for his Title VII-protected activity.

## III.    Section 1983 Claims

Employment-related race discrimination claims brought under § 1983 are analyzed under standards governing Title VII claims. *See Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 835 (7th Cir. 2015) ("When a plaintiff uses § 1983 as a parallel remedy to a Title VII harassment claim, the prima facie elements to establish liability are the same under both statutes."); *Davis v. Wis. Dep't of Corr.*, 445 F.3d 971, 976 (7th Cir. 2006) ("The same standards for proving intentional racial discrimination apply to Title VII and § 1983 equal protection claims."). Here, the only Title VII claim that survives summary judgment is Outley's hostile work environment claim, so his § 1983 claims based on the denied promotion, reduced overtime, constructive discharge, and retaliation allegations fail. *See Hildebrandt v. Ill. Dep't of Nat. Res.*, 347 F.3d 1014, 1036 (7th Cir. 2003) (holding that the "§ 1983 claims against the individual defendants [could] be dismissed on the same basis as the Title VII claims" where the plaintiff had "failed to set forth a prima facie case of discriminatory treatment").

As to the hostile work environment claim, the question is which Defendants could be held personally liable under § 1983 for the harassment that Outley suffered. For the individual defendants—Conner, Stark, and Mussen—it is fundamental that "the plaintiff must establish individual liability." *Johnson v. Rimmer*, 936 F.3d 695, 710 (7th Cir. 2019); *see also Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) ("Individual liability under § 1983 … requires personal involvement in the alleged constitutional deprivation.") (alteration and quotation marks omitted). Mussen plainly had personal involvement in harassing Outley, so Mussen cannot obtain summary judgment on the § 1983 hostile work environment claim. Outley's motion for summary judgment on his § 1983 claim against Mussen is denied at the threshold because the pertinent portion of Outley's brief, Doc. 217 at 15-16, violates Local Rule 56.1(g). *See* N.D. Ill. L.R. 56.1(g) ("When addressing facts, the memorandum must cite directly to specific paragraphs in the LR 56.1 statements or responses."); *Mervyn v. Nelson Westerberg, Inc.*, 142 F. Supp. 3d 663 (N.D. Ill. 2015).

For the § 1983 claims against Conner and Stark, "[p]ersonal involvement in a subordinate's constitutional violation requires supervisors to 'know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see.'" *Taylor v. Ways*, 999 F.3d 478, 494 (7th Cir. 2021) (quoting *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012)). There is no evidence that Conner or Stark knew about Mussen's harassing conduct, so Outley's claims against them fail.

Outley's only complaint about Conner is that he was "not receptive to hearing about the negative treatment [Outley] was receiving." Doc. 243 at ¶ 93. But the cited portion of Outley's deposition in fact shows that he did not even try to raise the issue with Conner. Outley testified to the following interaction with Conner: "He was coming in to the plant, he stopped over where

36

I was.  I said you're the new commissioner?  He said yes.  I said, well, I'm the reason you got the job."  Doc. 222-7 at 128:13-16.  Conner then "walked away," *id*. at 128:18, so their conversation did not broach the subject of Mussen's harassment of Outley.  Outley points to no other evidence that Conner would have been aware of that harassment.

The case against Stark fails as well.  Outley points to his testimony that, "when [he] was reassigned to Jardine," he went to speak with Stark on the subjects of "justice, integrity, personnel rules, collective bargaining agreements."  Doc. 243 at ¶ 94; Doc. 222-7 at 113:12-15.  Stark refused to engage and retreated to his office.  Doc. 222-7 at 114:4-7.  Outley's reassignment to Jardine occurred in 2013, Doc. 242 at ¶ 34, before Mussen became a COE in 2015, and in any event, there is no evidence that Outley made Stark aware at that time of Mussen's harassment.

To hold the City liable under § 1983, Outley must establish one of the bases for liability articulated in *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  To succeed on a *Monell* claim, "[a] plaintiff must show that the [constitutional] violation was caused by (1) an express government policy; (2) a widespread and persistent practice that amounted to a custom approaching the force of law; or (3) an official with final policymaking authority."  *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021).  Outley admits that the City had no express policy condoning racial harassment in the workplace, Doc. 241 at 29, and there is no suggestion that Mussen was an official with final policymaking authority.

So Outley's *Monell* claim survives only if he has adduced evidence of a widespread and persistent practice of racial harassment and discrimination at DWM amounting to a custom approaching the force of law.  It is a difficult question whether the record would allow a reasonable jury to find that a persistent practice of racial discrimination at DWM caused the

racial harassment Outley suffered. There is no need to answer that question, at least at this juncture, because it is appropriate to bifurcate trial on Outley's hostile work environment-based *Monell* claim against the City from trial on his Title VII hostile work environment claim against the City and hostile work environment-based § 1983 claim against Mussen. Civil Rule 42(b) provides: "For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." Fed. R. Civ. P. 42(b). The Seventh Circuit has held that "[t]he district court has considerable discretion to order the bifurcation of a trial." *Krocka v. City of Chicago*, 203 F.3d 507, 516 (7th Cir. 2000).

If Outley prevails on his Title VII claim against the City and/or his § 1983 claim against Mussen, it is difficult to see how he could obtain additional damages from a trial of his *Monell* claim against the City given that the harms he suffered are the same for all three claims. *See Swanigan v. City of Chicago*, 775 F.3d 953, 962 (7th Cir. 2015) ("If a § 1983 plaintiff seeks only monetary relief, and if a municipal defendant is willing (or required) to indemnify individual defendants for compensatory damages as well as an award of attorney's fees and costs, a *Monell* claim against the municipality will offer a prevailing plaintiff no additional remedy (aside, perhaps, from nominal damages)."). Likewise, if Outley loses on his Title VII claim against the City and his § 1983 claim against Mussen, it is difficult to see how he could then prevail on his *Monell* claim against the City. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (holding that because the plaintiff failed to prove that the individual defendants violated his constitutional rights, there was no viable *Monell* claim based on the same allegations); *Swanigan*, 775 F.3d at 962 ("If the plaintiff fails to prove a violation of his constitutional rights in his claim against the individual defendants, there will be no viable *Monell* claim based on the same

allegations.") (internal citations omitted); *Davis*, 445 F.3d at 976 ("The same standards for proving intentional racial discrimination apply to Title VII and § 1983 equal protection claims."). This case therefore does not present the circumstances presented in *Thomas v. Cook County Sheriff's Department*, 604 F.3d 293, 305 (7th Cir. 2010), where a plaintiff's *Monell* verdict against the municipality was not inconsistent with a defense verdict against the individual § 1983 defendants. *See Swanigan*, 775 F.3d at 962 ("[T]he judge's decision to stay the *Monell* suit while the claims against the individual officers were litigated to judgment was sensible, especially in light of the volume of civil-rights litigation that district courts must manage.").

## Conclusion

Defendants' summary judgment motion is denied in part—as to Outley's Title VII hostile work environment claim against the City and harassment-based § 1983 claim against Mussen— and otherwise is granted. Outley's summary judgment motion is denied. Outley's surviving claims will proceed to trial.

October 12, 2021

_____
United States District Judge